# Illinois Official Reports

## Appellate Court

---

### *People v. Nixon*, 2015 IL App (1st) 130132

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CARLTON NIXON, Defendant-Appellant. |
| District & No. | First District, Fifth Division<br>Docket No. 1-13-0132 |
| Filed | June 26, 2015 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 07-CR-12183; the Hon. Angela Minari Petrone, Judge, presiding. |
| Judgment | Affirmed; fee vacated. |
| Counsel on Appeal | Michael J. Pelletier, Alan D. Goldberg, and Kathleen Hill, all of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Mary L. Boland, and Brian K. Hodes, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE GORDON delivered the judgment of the court, with opinion.<br>Presiding Justice Palmer and Justice McBride concurred in the judgment and opinion. |

**OPINION**

¶ 1     Defendant Carlton Nixon was found guilty after a jury trial of aggravated sexual assault and sentenced to 30 years in the Illinois Department of Corrections (IDOC).

¶ 2     On this direct appeal, both the State and the defense request this court to vacate a $100 Crime Lab Drug Analysis Fee, which was erroneously imposed upon defendant since it is applicable only to certain drug offenses. 730 ILCS 5/5-9-1.4(b) (West 2012).[1] Thus, we order this fee vacated. *People v. Alvidrez*, 2014 IL App (1st) 121740, ¶ 35 (vacating fines and fees on appeal that were erroneously imposed by the trial court); *People v. Price*, 375 Ill. App. 3d 684, 702 (2007) (vacating a fee and fine on appeal that was "erroneously assessed by the trial court").

¶ 3     In addition, defendant asks us to reverse his conviction and remand for a new trial on the ground that the trial court erred in allowing the State to elicit testimony about a business record: (1) where the State allegedly failed to establish a proper foundation for the record; and (2) where the State allegedly denied the record's existence. As for the record itself, as opposed to the testimony about it, the trial court stated that it admitted the record "into evidence to preserve it for the record but not to publish it to the jury." The court stated that the only purpose for admitting the record itself was "[i]f it should be necessary for appellate review of that." In addition, neither side mentioned the record or the testimony about it during closing argument. Thus, defendant's claim is directed solely to the eliciting of testimony but does not concern argument.

¶ 4     In response, the State argues, among other things, that testimony concerning the record was harmless beyond a reasonable doubt in light of the other overwhelming evidence against defendant. The evidence identifying defendant as the assailant included: (1) a full DNA match between defendant's DNA profile and the DNA profile from the rape kit swab, where the alleles matched at all 13 loci; (2) the victim's selection of defendant as her assailant from a photographic array; and (3) other crimes evidence which included testimony by the victim of an attempt sexual assault concerning a similar offense by defendant. However, defendant does not contest the State's argument that the other evidence was overwhelming and does not challenge the sufficiency of the evidence against him.

¶ 5     Defendant claims that his case hinged on creating a reasonable doubt based on evidence that the victim previously selected another man, Eric Lynon, out of a photographic array as possibly her assailant. At trial, the State elicited testimony about the disputed record to the effect that Lynon's DNA profile was entered into the government's DNA database shortly after the profile from the rape swab kit was entered and that no association was reported. As noted, defendant does not contest that the other evidence against him was overwhelming; instead he claims that his defense was harmed, that he was denied the right to a fair trial and that the trial court erred in denying his motion for a mistrial.

---

[1]"When a person has been adjudged guilty of an offense in violation of the Cannabis Control Act, the Illinois Controlled Substances Act, the Methamphetamine Control and Community Protection Act, or the Steroid Control Act, in addition to any other disposition, penalty or fine imposed, a criminal laboratory analysis fee of $100 for each offense for which he was convicted shall be levied by the court." 730 ILCS 5/5-9-1.4(b) (West 2012).

¶ 6    For the following reasons, we do not find persuasive defendant's claim for a new trial, and we affirm his conviction and sentence. However, we vacate his $100 Crime Lab Drug Analysis Fee.

¶ 7                                   BACKGROUND

¶ 8    On June 13, 2007, a grand jury charged defendant with the aggravated criminal sexual assault of J.O., which occurred on August 17, 1999. After a jury trial, he was convicted on September 13, 2012, and sentenced on December 13, 2012, to 30 years in the Illinois Department of Corrections.

¶ 9    Since the sole issues on appeal concern a record about Eric Lynon and his DNA profile, we provide here a detailed summary of the pretrial proceedings concerning Lynon, which occurred in 2011 and 2012.

¶ 10                I. 2011 Pretrial Proceedings Concerning Lynon's DNA Profile
¶ 11                             A. 2011 Defense Motions

¶ 12    On March 30, 2011, defendant filed a motion to dismiss on the ground that the State had produced an incomplete police report in discovery. The report, which was attached to defendant's motion, is dated September 23, 1999, and is the "Supplementary Report" of Officer "L. Thezan."[2] The report stated that it was "an Area 3 *** Sexual Assault Progress Report" and that it concerned the victim in the case at bar. In his motion, defendant claimed that the report contained more than the two pages produced and that the report referred to photographs of possible suspects, including Eric Lynon, which had not been produced.

¶ 13    On April 8, 2011, defendant filed a motion to produce "all material relating to Eric Lynon." Attached to the motion was exhibit A, which was the previously missing third page of Officer Thezan's report, and which stated in full:

     "The R/D then showed [the victim] a group of five black and white computer generated photographs which included a photograph of Eric Lynon. When she came to the photograph of Lynon she put it aside. She looked at the rest of the photographs and then returned to Eric Lynon stating that she believed that he is the person that attacked her that his picture had jumped out at her.[3]

     The R/D then returned to the Area. This investigation continues pending the comparison of the DNA evidence in this case and the DNA of Eric Lynon."

¶ 14    Attached as exhibit B to defendant's motion was a "General Progress Report," dated August 17, 1999, from the Chicago police department, and it stated in full:

     "A buccal swab was taken from the victim's boyfriend, [name], and will be compared against the DNA found in the victim.

---

[2]Detective Thezan testified on February 10, 2012, that his first name was Lawrence.

[3]At a subsequent pretrial proceeding on December 20, 2011, Detective Robert Elmore testified that the victim stated Lynon "may" have been the man who attacked her. At another pretrial proceeding on February 10, 2012, Detective Lawrence Thezan testified that the victim made "a tentative identification" of Eric Lynon from the photo array.

Contacted Lambatos[4] from the State Crime Lab who will have Springfield compare the DNA found in the victim against [Officer] Thezan's and [Detective] Elmore's suspect, Eric Lynon.

[Detective] Tallen[5]"

¶ 15 On December 21, 2011, defendant filed a supplemental motion to produce, in which he stated that he had not received: (1) an arrest report for Lynon; (2) a lineup/photo advisory form signed by the victim in relation to the photo array mentioned in Officer Thezan's September 23, 1999, report; (3) any notes, reports or documentation concerning any interview of Lynon; (4) any "DNA material relating to Eric Lynon"; or (5) an order for a buccal swab for Lynon. The motion also stated that defendant had received a document which stated that Anthony McNeal was " 'no match' " to this case; but that it had not received any police reports, lab reports or documentation concerning Anthony McNeal.

¶ 16                                    B. 2011 Hearings
¶ 17                                1. July and August 2011
¶ 18 On July 28, 2011, the parties appeared in court, and defendant asked the trial court to direct someone from the Illinois State Police Crime Lab to come to court so that they could "resolve once and for all if there's any more outstanding material at the State lab." The trial court agreed, stating that it "want[ed] some authority from the lab."

¶ 19 At the next hearing, on August 18, 2011, Cecilia Doyle appeared[6] and she informed the court that she was "the biology DNA section chief of the Illinois State Police" lab in Chicago. The trial court asked her the following questions:

"THE COURT: So do you know right now if there [are] any reports regarding Eric Lynon, or if you don't, would you be able to assure us that there will be a thorough check and an answer given one way or another on another date?

DOYLE: I do know.

THE COURT: Okay. Could you please let us know.

DOYLE: Certainly. Back in April, on April 14th, actually, [defense counsel] had called me at the lab and had faxed over this information, and I performed a search of comps for Eric Lynon's name. And also, based on the information in this paperwork, the SID number, FBI number and date of birth for Eric Lynon, we did a search of CODIS,[7] and his name did not come up in CODIS. And I provided that information to [defense counsel] the next day.

---

[4]At a hearing on August 18, 2011, Cecilia Doyle, the DNA section chief at the Illinois State Police Lab, stated that Sandra Lambatos was an analyst at the lab.

[5]At a hearing on August 18, 2011, the trial court asked the prosecutor whether "this Tallen that signed" the report was "a detective that worked on this case," and the prosecutor replied "[y]es."

[6]The transcript of the August 18, 2011, hearing does not indicate that Ms. Doyle was sworn by the trial court before being asked questions. However, on December 20, 2011, the trial court stated that he asked "the supervisor of the DNA section of the Illinois State Crime Lab to testify under oath."

[7]"CODIS is the acronym for the 'Combined DNA Index System' and is the generic term used to describe the FBI's program of support for criminal justice DNA databases as well as the software

- 4 -

THE COURT: Back in April?

DOYLE: Back in April. I left a message on his phone.

THE COURT: Thank you. Do you think there is any–I'm satisfied by Ms. Doyle assuring me that she has done the search, that there is nothing else at the lab."

¶ 20　　Then the trial court asked defense counsel if he had any "information to indicate to the contrary." Defense counsel responded that it was "inexplicable" to him how the State Lab could have no information in light of the specific references in the police officers' reports to both the crime lab and DNA comparisons for Lynon.

¶ 21　　The trial court then gave defense counsel an opportunity to question Doyle:

"DEFENSE COUNSEL: Ms. Doyle, does the name Lambatos have any significance to you?

DOYLE: Is it Sandra Lambatos? She was an analyst at the Chicago crime lab for the State. ***

DEFENSE COUNSEL: You are aware that she worked on this case; correct?

DOYLE: From the paperwork that you provided me. I didn't have a recollection that she worked on the case.

DEFENSE COUNSEL: Do you know if the DNA evidence of the victim in this case was compared to Eric Lynon?

DOYLE: There was no Eric Lynon in our comp system, which is our computer assisted laboratory information management system, and that is where we track all of the evidence that comes into the lab. So if it hasn't been entered into that system, it hasn't come into the lab."

¶ 22　　In the above exchange, defense counsel questioned Doyle about Sandra Lambatos, whose name appeared in Detective Tallen's "General Progress Report," dated August 17, 1999. The report stated: "Contacted Lambatos from the State Crime Lab who will have Springfield compare the DNA found in the victim against [Officer] Thezan's and [Detective] Elmore's suspect, Eric Lynon."

¶ 23　　The trial court then questioned Doyle further concerning Lambatos:

"THE COURT: If Sandra Lambatos had been contacted to compare DNA, she would–would protocol be that she would have done some paperwork?

DOYLE: Yes. There would have been a conversation record in her file if she had contact with the agency.

THE COURT: Do you know if such a conversation record is in her file?

DOYLE: I have not reviewed her file."

---

used to run these databases. *** [I]n the case of a sexual assault where an evidence kit is collected from the victim, a DNA profile of the suspected perpetrator is developed from the swabs in the kit. The *** profile *** is searched against their state database of convicted offender and arrestee profiles ***." The Federal Bureau of Investigation: Frequently Asked Questions (FAQs) on the CODIS Program and the National DNA Index System, https://www.fbi.gov/about-us/lab/biometric-analysis/codis/codis-and-ndis-fact-sheet (last visited May 12, 2015).

¶ 24    The prosecutor then indicated that she had Lambatos' file, and Doyle stated that she would review it. While Doyle was reviewing Lambatos' file, the trial court asked the attorneys if either of them had spoken with Detective Tallen and both said they had not.

¶ 25    Doyle then indicated that she had completed her review. In response to a question from the court, she stated that Lambatos was no longer with the lab. The court then inquired:

"THE COURT: But you have her complete file in front of you.

DOYLE: Yes.

* * *

THE COURT: What have you found, if anything?

DOYLE: That there is just an indication in Sandra Lambatos' file, the report dated December 1st, 1999, of speaking with Detective Barrett from Area 3, about the submission of a standard from the boyfriend.

* * *

DOYLE: These are the only conversation records in Sandra Lambatos' file that mention Detective Tallen. There is a conversation record in Peter Bosco's biology file, speaking to Detective Tallen about the need for an elimination standard from the boyfriend. *** Sandra Lambatos, she left a message for Detective Barrett on 10/20/99 and spoke to her later that day at 3:00 p.m. on 10/20/99. Detective Barrett returned her call, said she would talk to Detective Tallen and probably they would submit the standard from [the] boyfriend."

¶ 26    After defense counsel reiterated what was in the officers' report concerning Eric Lynon and DNA, the trial court responded:

"THE COURT: But as far as Ms. Doyle and the State crime lab, *** [s]he's reviewed all the records from Ms. Lambatos ***, has done a check by the name of Eric Lynon in your database; correct?

DOYLE: Correct.

THE COURT: And you're telling us that you don't have any reports based on all of that for Eric Lynon or other additional reports that haven't already been tendered regarding [defendant]?

DOYLE: Correct."

¶ 27                                2. December 2011

¶ 28    On December 20, 2011, Detective Robert Elmore was sworn and testified in court pursuant to defense counsel's subpoena. He testified that, on September 21, 1999, he and Detective Lawrence Thezan went to the victim's house to show her a photo array. Elmore testified:

"ELMORE: While she was viewing the photo array, these were separate photos, she put one photo aside and came back to it, and she said this photo jumped out at her while she was viewing the photo array. She said that this may have been the man who attacked her."

¶ 29    The selected photograph was of Eric Lynon. The officers' visit was memorialized in a supplementary report authored by Detective Thezan and dated September 23, 1999. They then requested a comparison between the DNA collected from the victim and Lynon's DNA. Elmore explained that they had shown the victim the photo array because they had looked in

the computer system for recent penitentiary releases for sex crime offenders, and noticed that Lynon was a recently released sex crime offender who lived close to where the attack had occurred. Since they observed Lynon's name in the registry, they knew that his DNA was on file and that is why they ordered a DNA comparison. However, Elmore did not know whether the comparison was done or what the result was, if it had been done. He did not recall receiving a report from the crime lab concerning any possible results.

¶ 30      Prior to testifying, the prosecutor had shown Elmore a general progress report, dated November 10, 1999. Elmore testified that the report stated that Lambatos from the State crime lab in Springfield had asked for a comparison of the DNA found in the victim against Thezan's and Elmore's suspect, Eric Lynon. Elmore testified that he had never spoken with Lambatos. The last day that Elmore worked on this case was the day that they showed the victim the photo array. Stuart Tallen was the main detective working on the case.

¶ 31      In preparation for testifying, Elmore input the case number into the computer in order to retrieve the relevant reports and, after reviewing everything, he did not find anything that indicated that Eric Lynon had ever been tested against the sexual assault kit in this case.

¶ 32      After Elmore's testimony, the trial court and counsel discussed a supplemental motion to produce by defendant which asked for, among other things, documents relating to Anthony McNeal. The prosecutor responded: "I don't even know that Anthony McNeil[8] exists. There has never been an Anthony McNeil."

¶ 33                    II. 2012 Pretrial Proceedings Concerning Lynon
¶ 34                          A. January 20, 2012, Hearing
¶ 35      At a hearing on January 20, 2012, defense counsel informed the court that he had obtained "a lab report directed to Detective Tallen that says the DNA profile of the victim in this case was compared to the DNA" of McNeal, and counsel tendered it to the prosecutor.

¶ 36      Detective Stewart Tallen appeared pursuant to defense counsel's subpoena, and testified that he was a retired detective who had worked for the Chicago police for 24 years. Tallen, who had worked on this case, testified that the description for the perpetrator was an African American male between the age of 25 to 35 years old and approximately 6 feet tall. Shortly after the incident on August 17, 1999, an individual was arrested fitting that description and his name was Ronald Crawford. Crawford was arrested on August 20, 1999, and a DNA buccal swab was obtained from him and sent to the crime lab. When Crawford was arrested, he possessed a knife and some keys; and the victim had reported that the perpetrator used a knife and removed some keys from her. On October 20, 1999, Detective Tallen received a report from the Illinois State Crime Lab concerning Crawford, and the report stated that a vaginal swab from the victim was in inventory with the crime lab, that it was compared to a buccal swab standard from Crawford, and that the comparison was negative.

¶ 37      Tallen testified that a buccal swab standard was also obtained from the victim's boyfriend, in order to exclude him from what evidence was found. This swab was also sent to the Illinois State Police, and Tallen received back a report from the lab, dated March 6, 2000, which stated that no match was detected between the boyfriend's profile and the unknown DNA profile on the vaginal swab from the victim.

---

[8]Anthony McNeal's name is spelled "McNeil" is this particular transcript.

¶ 38    Tallen testified that Eric Lynon became a suspect when the victim selected him from a photo array. On a general progress report, dated November 10, 1999, Tallen wrote: that a buccal swab was obtained from the victim's boyfriend and would be compared against the DNA found in the victim; and that Tallen had contacted Lambatos from the State Crime lab "who will have Springfield compare the DNA found in the victim against these" and Eric Lynon. Tallen did not recall whether he received a report from the Illinois State Police concerning Lynon.

¶ 39    Tallen testified that a buccal swab was also obtained from Anthony McNeal, and that he made a request, dated November 3, 1999, to compare McNeal's DNA to DNA in this case and other cases. Tallen received a report back from the Illinois State Crime Lab, dated January 29, 2000, confirming that McNeal's DNA had been compared to the DNA in this case. However, Tallen did not recall a specific reason why McNeal's DNA was compared in this case.

¶ 40    Tallen testified that on December 21, 2001, he authored a supplemental report in this case requesting that this case be classified as suspended. Tallen did not believe that the first suspect, Ronald Crawford, was placed in a lineup and he did not have any photographs of a lineup with Crawford. Tallen did not recall if a photo array was done with Crawford.

¶ 41    On cross, Tallen testified that Lynon was a suspect based on information that Lynon was recently paroled to the area where the attack occurred. Tallen never obtained a buccal swab from Lynon. A request was made to the Illinois State Police in Springfield to do a search in their CODIS database to determine whether there was a match between Eric Lynon and the sexual assault kit submitted in this case. However, the DNA standard they had for Lynon was in the RFLP system. Back in 1999, there were two different methods of categorizing DNA, RFLP and STR, and they were in the process of switching to the newer STR system. The Chicago police were notified that the offender's profile would have to be converted to the STR system and placed into the CODIS system that way. After that, Tallen did not receive any further notifications with respect to the results of a CODIS search and Eric Lynon.

¶ 42    Tallen testified that, in general, when Illinois State Police received DNA evidence in a crime, they would submit the profile of an unknown suspect into the database to see if it matched the profile of anyone already contained in the database. From the time that Eric Lynon was first named as a potential suspect in this case until the time when Tallen retired in 2006, Tallen did not receive a notification from the Illinois State Police that there was an association between Lynon and the DNA recovered in the sexual assault kit in this case. With respect to Anthony McNeal, his buccal swab was obtained in relation to a burglary case. Tallen suspended his investigation in the case at bar because he had no other leads, but "there was a hit in 2005 for the defendant." Aside from that notification, Tallen did not receive any other notifications of associations found with the DNA found in the sexual assault kit in this case.

¶ 43    On redirect, Tallen testified that he contacted the State Crime Lab to have a comparison done between Lynon and the DNA in this case, and he did not recall whether he received a result.

¶ 44    After Tallen's testimony, the prosecutor informed the trial court that she had provided defense counsel with a document showing that on December 23, 1999, Eric Lynon's DNA was converted from the former RFLP system to the newer STR system and input properly into CODIS on December 23, 1999; and thus, Lynon's DNA was "able to be run against the DNA submitted in the sexual assault kit." The prosecutor explained that Lynon's DNA was originally received on November 12, 1992, but it was not converted until December 23, 1999.

¶ 45      This document was later identified at trial as People's Exhibit 22 and it became the subject of the State's September 4, 2012, motion *in limine*, discussed below. It is also the subject of the sole ground for reversal argued on is appeal. Since the document is so central to this appeal, we attempt to recreate its appearance and content[9] below:

Illinois State Police
Offender DNA Database
Sample Status
Friday, January 20, 2012, 12:52 PM

| Name | Lynon, Eric |
|---|---|
| DOB/Age | [Omitted] |
| Race | Black |
| DOC # | [Omitted] |
| SID # | [Omitted] |
| Received Date | 11/12/1992 |
| DNA Complete Date | 12/23/1999 |

¶ 46      In response to receiving the above document, defense counsel stated "in previous proceedings I was told there was nothing further regarding Eric Lynon, nothing. Now I have a new document received for the first time today dated 12/23/1999, a one page document that says DNA complete date. No further records regarding this, Judge. I would like to investigate this further. *** This can't be all they have, one page regarding DNA."

¶ 47      The Assistant State's Attorney (ASA) responded:

"ASA: Your Honor, all it is[,] is you look into the computer and ask whether somebody has been added to CODIS.

THE COURT: So your investigation is that that's all there is.

ASA: That's all there is."

¶ 48      Defense counsel then asked for 30 days to investigate this document further and the trial court set a status for three weeks later, stating that it would give counsel more time if he needed it.

¶ 49                          B. February 10, 2012, Hearing

¶ 50      Defense counsel observed that when the DNA chief testified, she stated that there were no documents regarding Eric Lynon. However, she was mistaken because at the last hearing the State tendered a document showing that Lynon was in the system.

¶ 51      Detective Lawrence Thezan appeared and testified that he was a retired detective from the Chicago police department where he worked for 30 years. On September 21, 1999, he and Detective Elmore met with the victim in this case at her residence and she made "a tentative

---

[9]Lynon's date of birth and age, as well as the "DOC" and "SID" numbers, appear in the actual exhibit, but this identifying information is omitted from our opinion because it is not necessary to resolve the issues on appeal.

identification" of Eric Lynon from a photo array. Thezan then identified the report he authored on September 23, 1999, memorializing this event.

¶ 52    Thezan also identified a general progress report, dated December 7, 1999, which he prepared and which listed Eric Lynon as the suspect. Thezan read into the record the last part of this report which stated:

> "The above suspect was photo ID'd by victim [name] but wanted to await results of DNA.
>
> This victim did not think the offender ejaculated. She did have sex with her boyfriend before the attack. Boyfriend submitted buccal for elimination 9 November '99. Case D408763 and D425147 are linked by DNA, same offender.
>
> Suspect in CODIS but type in RFLP system needs to be changed to STR system.[10] The RD learned of this from PO D. Troche, Unit 606.
>
> The RD spoke to Finn and Wilson of the Illinois State Police lab and faxed proper paperwork to them to work up December 8th 1999. Suspect in IDOC on parole violation.
>
> Pattern also stops after arrest on 13th September 1999. Also, suspect in D568962 and D573060, both batteries, 11 September and 13 September '99, awaiting CODIS. Thezan, No. 20880."

¶ 53    Thezan confirmed that it was the victim who wanted to wait for the results of the DNA comparison. However, Thezan did not receive DNA results with respect to Lynon, and he did not speak subsequently with Finn and Wilson of the Illinois State Police. Thezan did not obtain a buccal swab for Lynon, and he did not interview Lynon.

¶ 54    On cross, Thezan explained that this was not his case, and Elmore was not his regular partner. When he stated in the report that he was "awaiting CODIS," what he meant was that if an individual's DNA profile which is in CODIS was linked to a sample in a case under investigation, he would be notified of the hit. On redirect, Thezan testified that "there wasn't a hit" between Lynon and this case because he "was never notified or nobody else in the area was notified."

¶ 55                          C. February 28, 2012, Status

¶ 56    When the trial court was trying to set a trial date, defense counsel stated: "Judge, I have a document that was tendered two court appearances ago regarding DNA complete date for Eric Lynon and that indicates it was done 12-23-99, so we would like to investigate this, your Honor." Trial was then set for August 20, 2012. The trial court held a hearing on June 29, 2012, on defendant's motion to suppress a photographic identification of defendant by the victim, which was denied by the trial court and which is not at issue on appeal.

¶ 57                      D. September 4, 2012, Hearing on Motions

---

[10]On January 20, 2012, Detective Tallen had explained that, back in 1999, there were two different methods of categorizing DNA, RFLP and STR, and they were in the process of switching to the newer STR system.

¶ 58    On August 27, 2012, defendant filed a motion *in limine* to bar the State from introducing evidence that defendant's DNA profile was in the CODIS database, on the ground that such evidence would indicate to the jury that he was a previously convicted felon.

¶ 59    On September 4, 2012, a week before trial, the State filed a motion *in limine* which stated that it: "requests that, if defendant calls into question the manner in which CODIS functions, witnesses from the Illinois State Police Crime Laboratory be allowed to explain how CODIS works, as well as, specifically testify as to when the individual profiles of defendant, Carlton Nixon, as well as, Eric Lynon were entered into the CODIS database." Attached to this motion was a document entitled: "Illinois State Police[,] Offender DNA Database[,] Sample Status[,] Tuesday[,] August 28, 2012[,] 2:04 p.m." The document states that it concerns Eric Lynon and that his "DNA Complete Date" was "12/23/1999." On January 20, 2012, defense counsel had acknowledged in open court that he had received a similar document. The two documents are identical except for the fact that one has a status date of August 28, 2012, and the other has a status date of January 20, 2012.[11]

¶ 60    Also on September 4, 2012, defendant filed a motion *in limine* to bar testimony at trial that DNA evidence was compared to the DNA profile of Eric Lynon. The motion stated: "Defendant has sought any and all documentation of any comparison(s) of DNA evidence obtained from the victim and DNA of Eric Lyons. No documentation has been provided to date regarding any comparisons."

¶ 61    At the hearing on September 4, 2014, with respect to defendant's August 27 "CODIS" motion, the trial court held that the State may refer to a "State database," and that, "if the State believes the defense has opened the door to further questions about CODIS or [the] administrator in Springfield, I will ask for the State to ask for a sidebar, and I will grant it and [the State] can tell me specifically what the defense has done to open the door."

¶ 62    With respect to the other motions, defense counsel argued that the State should not be allowed to argue that Eric Lynon was "excluded," and the State agreed, but the State argued that it should be allowed to state that there was no "hit" for Lynon:

        "DEFENSE COUNSEL: Judge, the other thing I think the State made mention of is that somehow they should be allowed to present evidence that Eric Lynon was somehow not identified. Judge, the CODIS administrator when they issue a report that there is an association, he, the report they generate, actually clearly states this is not a basis to make an arrest. It's simply an investigative tool. So I don't know–I don't believe the State should be allowed [to] say Eric Lynon was somehow excluded. *** Eric Lynon was never swabbed and compared to the known sample in this case.

        ASA: Correct. We are never going to say that he was excluded. However, Kathleen Kovack, who would be notified of all the DNA hits in this case and who submitted the reports to the detective division in order to follow up on them, would be aware if Eric Lynon had a hit to this case. So we can say that there was never a match from the database regardless of whether there was a confirmatory of Eric Lynon and we do have confirmatory of the defendant in this case, which is what the statistics are based upon. So I would never say to the jury that Eric Lynon was excluded. I would, however, ask

_____

[11]It is the January 20 version that was identified as People's exhibit No. 22 at trial and that is at issue on this appeal.

that they be aware how this works and when they understand, you know that with the statistics and with the way the DNA functions, which will be explained through the Illinois State Police, the loci and the different numbers and the probabilities and the fact that he never did match through the database to this sample, they can argue that doesn't mean that he's excluded[.]"

¶ 63    The trial court then held that, if the defense wanted to argue that Eric Lynons was "the real offender" and that he was "not excluded," the defense could make that argument so long as it was a "reasonable inference" based on the "questioning of the witnesses." Defendant could argue to the jury that the State's failure to exclude Eric Lynon created "a reasonable doubt." However, the State could also make an argument "based on the testimony that comes out [1] that Eric Lynon was not a match from the database" and that [2] "Eric Lynon could not be the offender because the defendant was a match." The court held: "I'm not going to preclude [defendant] from making the argument that Eric Lynon couldn't be the offender because he was not excluded, and I am not going to [pre]clude the State from making the statement that Eric Lynon was not a match in the database and *** the defendant is a hit." The weight to give these arguments was "for the jury to determine."

¶ 64    The trial court reviewed defendant's September 4 motion and inquired of defense counsel:

"THE COURT: You want to bar testimony that DNA evidence was compared to Eric Lynon. I thought your defense was going to be that it was Eric Lynon? That the DNA was done, but it does not exclude him. You don't want that to come in? *** I thought you wanted that because you were just asking that the State not say that he was excluded."

¶ 65    Defense counsel responded: "what we are asking in our [September 4] motion is that they not be allowed to say that he was excluded." The trial court replied: "They already said they are not going to say that." Then the trial court inquired, with respect to defendant's September 4 motion: "It kind of got resolved?" And defense counsel agreed: "It kind of got resolved. That's correct."

¶ 66                                    III. Trial

¶ 67    Since defendant challenges neither the sufficiency of the evidence nor the State's contention that the other evidence against him was overwhelming, we provide a summary of the evidence at trial.

¶ 68    The State presented testimony from: (1) J.O., the victim; (2) Dr. Jordan Moskoff, who examined the victim after the attack and completed the sexual assault kit and who testified that she had redness and scratching on her neck and bruising on both knees; (3) J.K., the victim's boyfriend, who observed the victim after the attack and who helped her retrieve items from the crime scene; (4) M.E., who testified as the victim of a prior attempt sexual assault by defendant; (5) several DNA analysts, including Brian Schoon whose testimony is at issue on this appeal and is described in detail below; and (6) several police officers.

¶ 69                            A. The Victim's Testimony

¶ 70    The victim, J.O., testified that she was 35 years old and had grown up in Portage Park. She had attended Columbia College and was presently the manager of a doctor's office. Back in August 1999, when the offense occurred, she was 22 years old and a college student living with

her parents in the northwest suburbs. She also occasionally stayed with her boyfriend J.K. who lived in Rogers Park at that time. On the evening of August 16, 1999, she and J.K. had gone out, and she stayed at his apartment that night. They drove her vehicle, but they parked far from his apartment because there were no parking spots nearby. She woke up at 5:30 on the morning of August 17, because she shared the vehicle with her mother, and her mother needed the vehicle to go to work.

¶ 71        J.O. testified that, when J.O. left her boyfriend's building, she carried a basket of laundry to do at home. As she left, it was just getting light out, and she did not observe other vehicles or people. She was walking south on Lakewood, when she heard footsteps behind her and turned around. She observed a man walking behind her, which made her nervous because she had not observed anyone earlier. She kept walking toward her vehicle, and proceeded under a viaduct for the elevated tracks. Then she heard someone running behind her, and a man grabbed her by the arm and said: "Shut the f*** up. If you scream, I'll kill you." He grabbed her arm with one hand, and she felt pressure on her back which she assumed was a weapon since he said he would kill her.

¶ 72        J.O. testified that he turned her around, and they walked back in the direction she had come. J.O. testified that "it felt like he was trying to make it look like we were a couple walking down the street." After they walked through the viaduct heading north on Lakewood, they walked down a "gangway" which was along the viaduct for the railroad tracks and behind a building. The building appeared "under construction" and "boarded up" and "abandoned," and there were some bushes and a wooden fence. On one side of her was the brick wall of the building, and on the other side was the "concrete from the tracks, so it felt like we were in a corner of an alley."

¶ 73        J.O. testified that the man pushed her against the brick wall, so that she was facing the wall with her hands on the wall. Standing behind her, he pulled her jeans down, pulled her sweatshirt over her head, and ripped off her bra. Then he raped her. After he stopped, she put her clothes back on and tried to run in the direction that they had come. However, he pulled her by her hair, and she was struggling and fighting with him, because she believed her life was in danger. Then he used his body weight to push her against the wall, and he took off his belt and made a loop with it, put it around her neck and started to strangle her. She could not breathe and blacked out. When she regained consciousness, she observed him standing over her. He kicked her, took her "things," and ran through the bushes. Then she heard a dog barking, and she realized that the bushes were covering a sidewalk.

¶ 74        J.O. testified that she walked through "the fence area" and observed a man walking his dog. She tried to speak to him but she was so hysterical that he could not understand her. Eventually, she was able to state that she had just been raped and she asked him to walk her back to her boyfriend's apartment which was just a couple of blocks away, which he did, staying until her boyfriend opened the door. After the boyfriend opened the door, she told him what happened. She did not immediately notify the police because she "needed some time to calm down." J.O. and her boyfriend went back to the scene of the crime to look for her vehicle keys, driver's license and other identification which were missing. Although they did not find these items, they did retrieve her bra and then returned to the apartment to call the police. After the police arrived, they transported her to a hospital where she was examined by a doctor and nurses.

- 13 -

¶ 75    J.O. testified that on September 23, 1999, approximately five weeks after the attack, she met with two police detectives at her home where she reviewed several photographs. J.O. testified that "one picture jumped out at [her], but [she] wasn't sure" if this was her attacker. The record indicates this was a photograph of Eric Lynon. That was the end of her contact with detectives concerning this matter for a long time. Then, almost six years later, on August 17, 2005, she was contacted by the Chicago police who told her "that they had a DNA match" and asked her to come to the police station to review photographs again. After viewing a photographic array, she selected defendant's photograph as a photograph of the person who attacked her. J.O. also identified defendant in court as the person who attacked her.

¶ 76    On cross, J.O. testified that on August 17, 1999, the day of the offense, she told the police that her attacker was a black male, between 25 and 30 years old, 6 feet tall and 180 pounds. She may have viewed a lineup but she did not remember. J.O. testified that, on September 23, 1999, when she stated that a photograph jumped out at her, she "made it clear that [she] wasn't sure that, that was [her] attacker." On August 17, 2005, prior to viewing a second photographic array, she signed a form which informed her that the suspect may not be in the photo spread and that the person administering the spread may not know which person is the suspect. However, the detectives told her that they had identified someone through DNA evidence, and they showed her a number of photographs all at once. The person she selected was the only person in the array wearing a Chicago T-shirt. From the photograph, she could not tell the person's height, weight, right or left profile, or view from behind.

¶ 77    On redirect, J.O. testified that she was 5 feet tall, that she did not identify defendant as her attacker based on the T-shirt he was wearing, and that she observed his face when he attacked her. On recross, she testified that she observed her attacker's face twice but she did not "know how clearly [she] saw it at the time." When she selected Eric Lynon from the photo array on September 23, 1999, she "remember[ed] telling the detective at the time that [she] wasn't sure if that was the person."

¶ 78                        B. Testimony Concerning Lynon's DNA Profile
¶ 79    Testimony concerning the one record at issue on appeal occurred during the testimony of Brian Schoon, a DNA forensic scientist employed at the Illinois State Police crime lab in Chicago. Prior to Schoon's testimony, his colleague at the lab, Sandra Lambatos, explained that she had entered the male profile from the victim's vaginal swab into the State's database and that the profile would then be continuously compared to new profiles as they were added to the database.

¶ 80    Brian Schoon described his job as: collecting, examining and interpreting physical evidence associated with a crime or crime scene; and performing DNA analysis on biological evidence, writing reports on his findings and testifying when necessary. Schoon was received as an expert in forensic DNA analysis by the trial court without objection from the defense. Schoon testified within a reasonable degree of scientific certainty that the "human male DNA profile in the vaginal swabs matches the DNA profile" of defendant.

¶ 81    After Schoon testified about the DNA match, the prosecutor began to ask general questions about a state database, and defense counsel asked for a sidebar. Defense counsel then objected to the introduction of exhibit No. 22, which is the record at issue on this appeal. Counsel objected on the grounds (1) that "Mr. Schoon did not prepare this report" and (2) that he had previously made a request for DNA documents. The prosecutor responded: "I'm not going to

introduce the report as evidence. I am going to ask him to refer to it." She also stated that the defense had this document.

¶ 82    The following colloquy ensued:

"DEFENSE COUNSEL: [Schoon] was going to testify in terms of when Eric Lynon was in the database. We had asked [for] any information that they had about [Eric Lynon] being in the database.

THE COURT: There's nothing else besides this?

ASA: That's all I have.

THE COURT: If you can lay the proper foundation for a business record, I don't know if you can or not, this can come in as a business record. However, I don't want you to say offender or Illinois State Police database."

¶ 83    Then the State elicited the following testimony concerning exhibit No. 22:

"ASA: I'm going to show you [w]hat I've marked as People's Exhibit No. 22 for identification purposes and ask you first if you can tell me if you recognize what this is and without saying anything. Yes or no?

SCHOON: Yes.

ASA: Is that, in fact, a database sample status?

SCHOON: Yes, it is.

ASA: Is that a record that–where are those records kept?

SCHOON: The indexing or databasing lab in Springfield.

ASA: Are those records updated in the normal course of business?

SCHOON: Yes, they are.

ASA: What is–one second. Those records are made in the normal course of business, correct?

SCHOON: Yes, they are.

ASA: And they are updated regularly during the normal course of business, correct?

DEFENSE COUNSEL: Objection. Foundation.

THE COURT: You can answer, if you know.

SCHOON: Yes, they are.

ASA: And those are records that are made as a record of an act, correct?

DEFENSE COUNSEL: Objection. Foundation.

THE COURT: You can answer, if you know.

SCHOON: Can you repeat that?

ASA: A record of an event?

SCHOON: Yes.

ASA: Let me ask you if you can tell me what is the name on that sample sheet?

SCHOON: Eric Lynon.

DEFENSE COUNSEL: Objection. Judge. Foundation, hearsay.

THE COURT: Overruled.

ASA: Does that sheet show a DNA completion date for an individual by the name of Eric Lynon?

DEFENSE COUNSEL: Objection, Judge. Foundation, hearsay.

THE COURT: Overruled.

SCHOON: Yes, it does.

ASA: What is that date?

SCHOON: 12–

DEFENSE COUNSEL: Objection again, Judge. Foundation, hearsay.

THE COURT: I assume you have a running objection?

DEFENSE COUNSEL: Yes, Judge.

THE COURT: That will be preserved. It is overruled. You may answer.

SCHOON: 12/23/99.

ASA: Would that indicate that as of December 23, 1999, that a profile from Eric Lynon was a part of the database us[ing] PCS STR technology?

SCHOON: Yes, it was."

¶ 84     On cross, defense counsel asked:

"DEFENSE COUNSEL: You were asked some questions about this database information on Eric Lynon?

SCHOON: Yes.

DEFENSE COUNSEL: You personally have never actually looked at the profile of Eric Lynon?

SCHOON: Correct[ ], I have never.

DEFENSE COUNSEL: You have never been asked to look at a buccal sample for Eric Lynon?

SCHOON: Correct.

DEFENSE COUNSEL: And you don't know personally when that information for Eric Lynon was actually input into the database.

* * *

DEFENSE COUNSEL: You personally did not witness that information being put into the computer?

SCHOON: Oh. Correct.

* * *

DEFENSE COUNSEL: I asked you earlier about whether you had ever been given a buccal standard for Eric Lynon. Your answer was no, correct?

SCHOON: Correct.

DEFENSE COUNSEL: You were never actually asked to do a comparison of a buccal swab for Eric Lynon?

SCHOON: Correct."

¶ 85     On redirect, the ASA asked the following additional questions about Lynon and the Lynon record:

"ASA: Now, previously I asked you about a completion date for Eric Lynon and you indicated that the completion date, based upon your records, is December 23, 1999, correct?

SCHOON: Correct.

ASA: That profile in the database is continuously being run as additional profiles are being placed into this database, correct?

SCHOON: Yes.

ASA: And when that profile was put into the database, anything that was in there before, it would have been run against. Is that true?

SCHOON: Yes.

ASA: That's the function of the database, correct?

SCHOON: Yes.

ASA: It continuously runs.

SCHOON: Yes. Every time something new is entered in, it is searched against everything else that's in there.

ASA: And those are the full profiles that are in the database, the 13 markers, is that correct, for the database that we are referring to with regard to Eric Lynon?

SCHOON: Yes.

ASA: Nothing further."

¶ 86    At the conclusion of Schoon's testimony, the defense moved for a mistrial on the ground that the State had initially denied the existence of People's exhibit No. 22. Defense counsel also stated: "Why can't they produce all the supporting documentation in his profile? If they did put his profile in there they had to do workup like they did in this case." The trial court denied the motion stating:

"THE COURT: I don't know how to get what you're saying exists except [to] go through everything we've been doing for the past year to see if it exists.

I wanted you to have whatever there is. That's why I kept continuing the case over and over, ordering the State to bring in people.

All the pretrial motions revealed to me is that basically once the police got a match of [defendant], they forgot about Eric Lynon and just let it go. ***

I don't know what else to do [or] say, [to find] that there's more paperwork. I think that's speculative."

¶ 87                    C. Trial Court's Ruling That Jury May Not See Record

¶ 88    Before the State rested, the prosecutor asked the trial court to admit the State's exhibits into evidence. Defense counsel objected to the admission of exhibit No. 22, which was the computer printout showing that Lynon's DNA profile was entered into CODIS. The prosecutor responded that the State was not seeking to have the exhibit published to the jury. The trial court then asked the prosecutor "[y]ou're seeking to admit it into evidence to preserve it for the record, but not to publish it to the jury," and the prosecutor responded "[c]orrect." The court then held that it was admitting the exhibit "into evidence" only "[i]f it should be necessary for appellate review" but it was "not going to allow it to be published to the jury." Immediately

after the trial court's ruling, defense counsel indicated his assent by stating: "Thank you, Judge."

¶ 89    Since defendant does not contest on appeal either the admissibility of the other evidence against him or that it was overwhelming, there is no need to discuss that evidence in detail on appeal. The only issues before us concern whether the State failed to establish a proper foundation for a business record and whether the State previously denied the record's existence. Neither the State nor defense counsel referred to the disputed record or the testimony about it during closing argument. Thus, there are also no issues before us concerning closing arguments.

¶ 90                              IV. Conviction and Sentencing

¶ 91    After listening to the evidence and closing arguments, the jury found defendant guilty on September 13, 2012, of the aggravated criminal sexual assault of J.O. on August 17, 1999.

¶ 92    Defendant filed a posttrial motion for a new trial on a number of grounds including that the trial court erred in allowing Brian Schoon to testify about People's exhibit No. 22, "an ISP database report purporting to show a DNA completion date" for Eric Lynon, over defendant's objection about "a lack of foundation." Defendant claimed that this testimony "led the jury to believe that Eric Lynon was excluded through DNA comparisons in violation of Defendant's Motion *in Limine* barring such testimony." Defendant also claimed that the trial court erred in denying defendant's motion for a mistrial based on this prejudicial evidence.

¶ 93    On December 20, 2012, the trial court denied defendant's posttrial motion and proceeded to sentencing. In aggravation, the prosecutor noted defendant's seven prior felony convictions including aggravated battery to a police officer and attempt aggravated criminal sexual assault. In mitigation, the defense observed that defendant is 35 years old, married, with four children and two stepchildren and that he was only 22 years old when this offense occurred. In addition, his mother was murdered when he was nine months old; he lived with his father when he was 8 to 12 years old, and he was physically abused by his father and sexually abused by a friend of his father. At 12, he was placed in the custody of the Department of Children and Family Services and lived in several different homes and attended several different schools, and thus lacked any real stability. He left school in the tenth grade.

¶ 94    The trial court also observed from the presentence report that defendant experienced an "unfortunate childhood," with his mother working as a prostitute for his father and that defendant was a good student, a member of Reserve Officers' Training Corps (ROTC) and on basketball and football teams. Defendant was placed in special education classes and attempted suicide as a child after he was molested. He first tried illegal drugs at age 11 and joined the Gangster Disciples at age 12.

¶ 95    After carefully considering all these factors and the testimony at trial, the trial court sentenced defendant to 30 years with IDOC. The defense immediately moved the trial court to reconsider the sentence on the basis that it was excessive, which the trial court denied. A notice of appeal was filed on December 20, 2012, and this direct appeal followed.

¶ 96                                      ANALYSIS

¶ 97    On this direct appeal, defendant asks us to reverse his conviction and remand for a new trial on the ground that the trial court erred in allowing the State to elicit testimony about a business

record: (1) where the State allegedly failed to establish a proper foundation for the record; and (2) where the State had allegedly denied the record's existence. The trial court admitted the record "into evidence to preserve it for the record but not to publish it to the jury," stating that the only purpose for admitting the record itself was "[i]f it should be necessary for appellate review of that." In addition, neither side mentioned the record or the testimony about it during closing argument. Thus, defendant's claim is directed solely to the eliciting of testimony but does not concern argument.

¶ 98    For the following reasons, we do not find defendant's claim persuasive.

¶ 99                                    I. Standard of Review

¶ 100    As both parties acknowledge, evidentiary rulings are generally reviewed for an abuse of discretion. *People v. Santos*, 211 Ill. 2d 395, 401 (2004); *Kovera v. Envirite of Illinois, Inc.*, 2015 IL App (1st) 133049, ¶ 55. The decision to admit or exclude evidence rests within the sound discretion of the trial court, and a reviewing court will not disturb that decision on appeal absent an abuse of discretion. *People v. Caffey*, 205 Ill. 2d 52, 89 (2001); see also *Snelson v. Kamm*, 204 Ill. 2d 1, 24 (2003). "The trial court must consider a number of circumstances that bear on" the issue of admissibility, "including questions of reliability and prejudice." *Caffey*, 205 Ill. 2d at 89. It is for this reason that a reviewing court owes such "deference to the trial court." *Caffey*, 205 Ill. 2d at 89. A reviewing court will apply a *de novo* standard of review to an evidentiary question only where " 'a trial court's exercise of discretion has been frustrated by an erroneous rule of law.' " *Caffey*, 205 Ill. 2d at 89 (quoting *People v. Williams*, 188 Ill. 2d 365, 369 (1999)).

¶ 101    An abuse of discretion occurs when the trial court's ruling is arbitrary, fanciful or unreasonable, or where no reasonable person would take the view adopted by the court. *Santos*, 211 Ill. 2d at 401; *Caffey*, 205 Ill. 2d at 89; *In re Estate of Klehm*, 363 Ill. App. 3d 373, 380 (2006). " '[E]ven where an abuse of discretion has occurred, it will not warrant reversal of the judgment unless the record indicates the existence of substantial prejudice affecting the outcome of the trial.' " *People v. Jackson*, 232 Ill. 2d 246, 265 (2009) (quoting *In re Leona W.*, 228 Ill. 2d 439, 460 (2008)). Thus, for example, our supreme court held in *Jackson* that no reversal was needed where the introduction of DNA database information did not prejudice defendant. *Jackson*, 232 Ill. 2d at 274.

¶ 102                                    II. Business Record

¶ 103    Defendant argues,[12] first, that the trial court erred by permitting the State to introduce testimony about a computer printout, namely, People's exhibit No. 22, showing that Eric Lynon's DNA profile was entered into the State's database in December 1999, without laying a proper foundation for the printout as a business record. Second, defendant argues that the introduction of this hearsay statement, without a proper foundation that it qualified under a

_____

[12]Defendant does not argue that testimony concerning the disputed record violated either the Sixth Amendment (U.S. Const., amend. VI ("[i]n all criminal prosecutions, the accused shall enjoy the right *** to be confronted with the witnesses against him"); see also Ill. Const. 1970, art. I, § 8) or the Illinois statutory prohibition against admitting, as a business record, any record made "during any investigation relating to pending or anticipated litigation of any kind." 725 ILCS 5/115-5(c)(2) (West 2012).

particular exception, undermined his right to a fair trial. We discuss both these arguments in separate sections below.

¶ 104                                    A. Computer-Generated Record

¶ 105    The party seeking to admit a purported business record into evidence has the burden of laying an adequate foundation for the business record. *People v. Universal Public Transportation, Inc.*, 2012 IL App (1st) 073303-B, ¶ 48. As noted, evidentiary errors of this nature are normally judged against the deferential standard of abuse of discretion (*e.g.*, *People v. Eagletail*, 2014 IL App (1st) 130252, ¶ 26 (admission of a computer-generated breathalyzer report as a business record was reviewed only for an abuse of discretion)).

¶ 106    Defendant cites section 115-5 of the Code of Criminal Procedure of 1963 (Code) which provides for the admission of business records as an exception to the hearsay rule. It states in relevant part:

> "Any writing or record, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any act, transaction, occurrence, or event, shall be admissible as evidence of such act, transaction, occurrence, or event, if made in the regular course of any business, and if it was the regular course of such business to make such memorandum or record at the time of such act, transaction, occurrence, or event or with a reasonable time thereafter.
>
> All other circumstances of the making of such writing or record, including lack of personal knowledge by the entrant or maker, may be shown to affect its weight, but such circumstances shall not affect its admissibility." 725 ILCS 5/115-5(a) (West 2012).

¶ 107    The Illinois Rules of Evidence, which were recently codified in 2011, also provide for a business records exception to the hearsay rule, namely, Rule 803(6) (Ill. R. Evid. 803(6) (eff. Jan. 1, 2011)). Rule 101 of the Illinois Rules of Evidence states that "[a] statutory rule of evidence is effective unless in conflict with a rule or a decision of the Illinois Supreme Court." Ill. R. Evid. 101 (eff. Jan. 1, 2011). Thus, to the extent that there is a conflict between section 115-5(a) of the Code and Rule 803(6), Rule 101 dictates that Rule 803(6) trumps the statutory section.

¶ 108    However, Rule 803(6) and section 115-5(a) are substantially similar. Although the State notes in its appellate brief that the defense cites the statutory section instead of the rule, the State also concedes that the two provisions are "substantially consistent." In addition, the committee comment to Rule 101 observes that "[t]here is no current statutory rule of evidence that is in conflict with a rule contained in the Illinois Rules of Evidence." Ill. R. Evid. 101, Committee Comment. Thus, the fact that the State quotes the rule and the defense quotes the statute has no effect on the outcome of this appeal.

¶ 109    Rule 803(6) provides in full:

> "(6) Records of Regularly Conducted Activity. A memorandum, report, record, or data compilation, in any form, of such acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record or data compilation, all as shown by the testimony of the custodian or other qualified

witness, or by certification that complies with Rule 902(11), unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness, but not including in criminal cases medical records. The term 'business' as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit." Ill. R. Evid. 803(6) (eff. Jan. 1, 2011).

¶ 110    In order to satisfy both the above-quoted rule and statutory section, the party seeking to admit a business record has the burden of laying an adequate foundation for it, which includes showing: (1) that the record was made as a memorandum or record of the act; (2) that the record was made in the regular course of business; and (3) that it was the regular course of the business to make such a record at the time of the act or within a reasonable time thereafter. *Universal*, 2012 IL App (1st) 073303-B, ¶ 48; *People v. Morrow*, 256 Ill. App. 3d 392, 397 (1993).

¶ 111    In addition to these requirements, Illinois courts have consistently held that, to establish an adequate foundation for a computer-generated record as a business record, the proponent must make a further showing. " 'In the case of computer-generated records, a proper foundation additionally requires a showing that: standard equipment was used; the particular computer generates accurate records when used appropriately; the computer was used appropriately; and the sources of the information, the method of recording utilized, and the time of preparation indicate that the record is trustworthy and should be admitted into evidence.' " *Universal*, 2012 IL App (1st) 073303-B, ¶ 48 (quoting *Morrow*, 256 Ill. App. 3d at 397, citing *Riley v. Jones Brothers Construction Co.*, 198 Ill. App. 3d 822, 829 (1990)). Accord *US Bank, National Ass'n v. Avdic*, 2014 IL App (1st) 121759, ¶ 25. See also *People v. Holowko*, 109 Ill. 2d 187, 192-93 (1985) (computer-generated records are admissible upon "proof of the accuracy and proper operation of the particular device" and "proof of the method of the recording of the information"). Opposing counsel may object on the ground that the evidence lacks a sufficient foundation. *Universal*, 2012 IL App (1st) 073303-B, ¶ 48.

¶ 112    Recently, this court discussed what was needed to satisfy the requirements for a computer-generated business record. In *Avdic*, we held that a bank employee, who was knowledgeable about the bank's computer system for recording loans, had established the foundation for a computer-generated business record by averring: (1) that the computer software system was customarily used in the business for this purpose; (2) that the same system had been in place during the relevant time period; (3) that the system was regularly checked and tested for reliability; and (4) that its access was restricted to trained personnel who had been authorized to use it. *Avdic*, 2014 IL App (1st) 121759, ¶ 25.

¶ 113    On appeal, the State does not argue that it made this additional showing. Instead it argues that it was not required to: (1) because defendant waived the issue by failing to object at trial; and (2) because the record was a computer-stored record rather than a computer-generated record. For the following reasons, we do not find either of these arguments persuasive.

¶ 114    First, defendant did object–repeatedly–to the lack of foundation for this record pursuant to the business records exception to the hearsay rule. When discussing the lack of foundation, the defense explained: "we don't know how this was generated. We don't know how the information was put into Cod[i]s, what's the basis of notice" when an association is made.

¶ 115    While the "best evidence rule" and "the business records exception to the hearsay rule," for example, are sufficiently "distinct objections" such that objecting on the basis of one does not

suffice as an objection to the other (*People v. Furby*, 138 Ill. 2d 434, 449 (1990)), the objection here to a lack of foundation for a specific exception to the hearsay rule was sufficient to preserve this issue for appeal, and the State does not cite a case that indicates otherwise. On this issue, the State cites only *People v. Enoch*, 122 Ill. 2d 176, 186-88 (1988), and *People v. Woods*, 214 Ill. 2d 455, 470 (2005). However, in *Enoch*, the defendant failed to file any posttrial motion, so that case is not instructive here, where defendant did file a posttrial motion. *Enoch*, 122 Ill. 2d at 185-86. Similarly, in *Woods*, the defendant failed to make any objection at trial to the chain-of-custody issue which he raised on appeal. *Woods*, 214 Ill. 2d at 469. *Woods* is also not instructive here where defendant did make an objection at trial. *Woods*, 214 Ill. 2d at 469 (defendant argued that an objection was not necessary because chain of custody went to the issue of sufficiency of the evidence, which is an issue not subject to the waiver rule; and the court rejected this argument). As a result, we do not find persuasive the argument that defendant waived the issue by failing to object at trial.

¶ 116        Second, the State argues that it did not have to satisfy these requirements because they apply to computer-generated records, and that People's exhibit No. 22 was not a computer-generated record but a record of computer-stored information. In support, the State cites *People v. Holowko*, 109 Ill. 2d 187, 189 (1985), which concerned the admissibility of a printout from a telephone " 'tracer,' " "an electronic device whereby a computer automatically records the telephone numbers of all calls coming into the 'trapped' telephone." Our supreme court held that, while printouts of computer-stored data were subject to the prohibition against records made during an investigation, printouts of "computer-generated data are different." *Holowko*, 109 Ill. 2d at 191. While "computer-stored data constitute statements placed into the computer by out-of-court declarants and cannot be tested by cross-examination," computer-generated data, such as that produced by a telephone tracer, is "merely the tangible result of the computer's internal operations." *Holowko*, 109 Ill. 2d at 191. As a result, printouts of computer-generated data were admissible, so long as the proponent offered "proof of the accuracy and proper operation of the particular device" and "proof of the method of the recording of the information." *Holowko*, 109 Ill. 2d at 192-93. In the case at bar, the State argues that it did not have to offer proof of the accuracy and proper operation of its database, because the database was merely storing information.

¶ 117        However, the State was not using the record for the mere purpose of showing that Lynon's profile was *stored* in the database, but for the fact that the database was continually *generating* comparisons against the stored profiles. During the discussion on this record's admissibility, the trial court observed "[t]his is a business record *generated* by the lab," and defense counsel responded that "we don't know *how* this was *generated*." (Emphases added.) Showing that the database is functioning smoothly is no different than showing that a telephone tracer is functioning properly before introducing the results of that device. Thus, we are not persuaded that the requirements for a computer-generated record do not apply.

¶ 118        As a result, defendant is correct that the State failed to establish an adequate foundation for this record.

¶ 119                                B. Not Reversible Error

¶ 120        However, even if the trial court erred, an evidentiary error does not serve as a reason to overturn a jury verdict, if other properly admitted evidence is overwhelming. *People v. Miller*, 173 Ill. 2d 167, 195 (1996) (although the State failed to lay a proper foundation and the trial

- 22 -

court abused its discretion in admitting the testimony, the abuse of discretion "was harmless error in light of the overwhelming evidence of defendant's guilt")[13]; see also *People v. Cortes*, 181 Ill. 2d 249, 285 (1998) (admission of other-crimes evidence was harmless beyond a reasonable doubt where the error was "unlikely to have influenced the jury"); *People v. Carlson*, 92 Ill. 2d 440, 449 (1982) (evidentiary errors may be considered harmless if the other properly admitted evidence is overwhelming). In the case at bar, defendant does not contest the admissibility of any of the other evidence and does not try to rebut the State's argument that the other properly admitted evidence was overwhelming. Thus, we can find no reversible error on the ground of a hearsay violation.

¶ 121                                    III. Disclosure of Record

¶ 122    Defendant's second contention is that the State should not have been allowed to elicit testimony about a document where the State had previously denied its existence; that the use of this document by the State undermined defendant's right to a fair trial; and that the trial court abused its discretion by failing to grant defendant's motion for a mistrial following Schoon's testimony about People's exhibit No. 22.

¶ 123    In support, defendant cites *People v. Redd*, 135 Ill. 2d 252, 323 (1990), in which our supreme court stated: "It is within the discretion of the circuit court to determine the propriety of declaring a mistrial. [Citation.] A mistrial should generally be declared only as the result of some occurrence at trial of such character and magnitude that the party seeking it is deprived of his right to a fair trial."

¶ 124    Although the State initially denied the record's existence, it produced the document on January 20, 2012, eight months prior to trial. Defendant twice asked for extensions of time in order to more fully investigate the record, which the trial court granted on January 20, 2012, and February 28, 2012. After the record's production in January 2012, the trial court permitted the defense to take the pretrial in-court testimony of Detective Lawrence Thezan who had authored a report stating that Lynon's profile was "in CODIS but type in RFLP system needs to be changed to STR system."

¶ 125    In sum, after the State produced the document in January 2012, the defense had eight months to probe and explore its existence. As a result, the State's initial denial from August 18, 2011, until January 20, 2012, did not subsequently deny defendant a fair trial or harm his ability to adequately prepare a defense.

¶ 126    Although the defense expressed concern prior to trial that the State might argue to the jury that there was never an association noted by the database between Lynon's profile and the profile from the rape swab kit, the State chose not to make that argument during closing.[14]

---

[13]*Miller* was abrogated on other grounds by *In re Commitment of Simons*, 213 Ill. 2d 523, 530 (2004) (adopting the approach taken by the specially concurring justice in *Miller*), where our supreme court held that a reviewing court could rely on materials which were not part of the trial record to determine whether a scientific technique is generally accepted in the relevant scientific community. However, the *Simons* ruling has no effect on our appeal or the validity of the holding for which we cite *Miller*.

[14]The State argued in closing that, when the profile from the rape swab kit was entered in 1999, the database did not return an association between it and an existing profile; and that the database

However, the defense did argue in closing–three times–that the State had never expressly excluded Lynon as the offender, an argument that would have been difficult to make without some evidence in the record that the State had Lynon's DNA profile in the first place.

¶ 127　The parties resolved prior to trial what testimony and arguments would be allowed about the record. Defendant made a motion *in limine* which sought "to bar testimony at trial that DNA evidence was compared to the DNA of Eric Lynon." The trial judge stated that she was confused by defendant's motion because she "thought your defense was going to be that that it was Eric Lynon? That the DNA was done but [the State] does not exclude him. You don't want that to come in? *** I thought you wanted that." Defense counsel explained that his motion sought to bar the State only from arguing that Lynon was excluded. When the court observed that the State had already agreed to that limitation, defense counsel acknowledged that this "resolved" his motion. It is hard to understand what prejudice defendant suffered by the State's earlier denial of the record's existence, when issues concerning testimony were "resolved" prior to trial and where defense counsel vigorously argued the State's failure to exclude Lynon during closing. In addition, the exhibit itself was not published to the jury, and defense counsel thanked the court for its ruling to preserve the exhibit for appeal but not publish it to the jury.

¶ 128　Defendant does not argue on appeal that, if he had known prior to January 2012 that Lynon's DNA profile was available, he would have sought the appointment of an expert to testify concerning it. Even if defendant had made this argument, it seems unlikely that this speculative course of action would have produced exculpatory results for defendant, in light of the fact that the State's DNA expert testified that there was a full 13-loci match between defendant's profile and the profile from the rape-kit swab.

¶ 129　If defendant is arguing that there was some prior deliberate misconduct on the part of the Illinois State Crime Lab and the DNA section chief who previously denied the record's existence, that allegation would be troubling if there was any evidence to support it. However, the trial record was not developed for the purpose of showing deliberate wrongdoing and that allegation would be better raised in a postconviction petition if further investigation warranted it. *E.g.*, *People v. Holloman*, 304 Ill. App. 3d 177, 186-87 (1999) (where the appellate record was not developed for consideration of a particular claim, it is better considered in a postconviction petition).

¶ 130　　　　　　　　　　　　　　　　　CONCLUSION

¶ 131　On this direct appeal, defendant asks us to reverse his conviction and remand for a new trial on the ground that the trial court erred in allowing the State to elicit testimony about a business record. For the foregoing reasons, we do not find defendant's claim persuasive, and we affirm his conviction and sentence. However, we vacate his $100 Crime Lab Drug Analysis Fee as both parties request.

¶ 132　Affirmed; fee vacated.

---

later returned an association with Carlton Nixon in 1999. However, the State did not argue at closing that Lynon was also in the database during that same timespan.