2021 IL App (2d) 190763-U
No 2-19-0763
Order filed January 26, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| OCWEN LOAN SERVICING, LLC, as Successor in Interest to Original Plaintiff American Home Mortgage Servicing, Inc. | ) ) ) ) | Appeal from the Circuit Court of Du Page County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 11-CH-2564 |
| ALFONSO DOMINGUEZ, KRISTEN DOMINGUEZ, VILLAGE OF LOMBARD, CENTURY BUILDING SUPPLY, INC., COUNTY OF DU PAGE, WILHERMINA JONES, MATTHEW JONES, PAUL D. JONES, UNKNOWN OWNERS, and NON-RECORD CLAIMANTS, | ) ) ) ) ) ) ) ) ) | |
| Defendants | ) ) | Honorable |
| (Alfonso Dominguez and Kristen Dominguez, Defendants-Appellants). | ) ) | James D. Orel Judge, Presiding. |

PRESIDING JUSTICE BRIDGES delivered the judgment of the court.
Justices Zenoff and Schostok concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The trial court's denial of defendants' motion for summary judgment merged with the trial court's judgment, and the trial court did not err in awarding plaintiff an equitable lien. Therefore, we affirm the judgment of the trial court.

¶ 2    Defendants, Alfonso Dominguez (Mr. Dominguez) and Kristen Dominguez (Mrs. Dominguez), obtained a loan to finance the purchase of a membership (Dwelling Unit) in a housing cooperative[1] known as the York Center Community Cooperative, Inc. (the Co-op). As members, they were entitled to occupy one of the homes in the Co-op, but title to the Dwelling Unit remained with the Co-op. In 2005 the Co-op was dissolved by court order and a judicial deed for the Dwelling Unit was entered in favor of the defendants. In December 2009, defendants stopped payment on the loan. Plaintiff, Ocwen Loan Servicing, LLC, filed a complaint alleging, *inter alia*, that it was entitled to an equitable lien on the Dwelling Unit. After trial, the court placed an equitable lien on Mr. Dominquez's interest in the Dwelling Unit. Defendants appeal.

¶ 3                              I. BACKGROUND

¶ 4    Plaintiff's predecessor in interest, American Home Mortgage Servicing, Inc., filed the initial complaint in this matter on May 28, 2011. American Home Mortgage later changed its name to Homeward Residential and was eventually purchased by plaintiff. Plaintiff filed an amended complaint on January 17, 2017, alleging the following claims against defendants: foreclosure on

---

[1] A housing cooperative is a type of residential housing whereby a company holds title to the property and the residents purchase an interest in the company representing their dwelling unit. Typically, the corporation issues the occupant a proprietary lease or occupancy agreement for a particular unit in a building in conjunction with the purchase of stock. *Quality Management Services v Banker*, 291 Ill App 3d 942, 945 (1997). However, as in the instant case, a co-op can instead consist of individual homes, and issue a membership in the co-op rather than stocks or a lease. See *Central. Terrace Co-op. v. Martin*, 211 Ill. App. 3d 130, 133 (1991).

mortgage (count I); foreclosure on cooperative loan security agreement (count II); foreclosure on Co-op membership (count III); declaratory judgment for an equitable lien (count IV); and foreclosure on equitable lien (count V). The parties filed cross motions for summary judgment prior to the trial, and the court denied both motions, finding that there were genuine issues of material fact. The matter proceeded to trial on January 7, 2019.

¶ 5      The following documents were introduced at trial: A Note in the amount of $126,600 dated October 4, 2001, listing Mr. Dominguez as borrower, First Home Mortgage as the lender, and 1S154 School Street, Lombard, IL, 60148, as the "Property Address"; between Mr. Dominguez and First Home Mortgage pledging the lease of "apartment 1 located at 1S154 School Street in Du Page County New York [*sic*]" and ".00" shares in the York Center Community Cooperative as security for the Note; a Certificate of Membership and Occupancy Agreement (Membership Agreement) granting membership in the York Center Community Cooperative to defendants, entitling them to occupancy of one dwelling unit in the Co-op; an Order and Plan of Dissolution (Dissolution Order) entered in *Reynolds v. York Center Community Cooperative,* No. 00-CH-01177 (Cir. Ct. Du Page County, May 5, 2005) dissolving the Co-op and ordering judicial deeds to be prepared conveying to the Co-op members their respective membership parcels; a Judicial Deed dated October 6, 2008, in defendant's names conveying to them the Dwelling Unit at 1S154 School Street, Lombard, IL, 60148; and an Affidavit of Lost Note signed July 10, 2015, by Lindsey Taylor as authorized signer for plaintiff, claiming to have been in possession of and subsequently lost the Note.

¶ 6      At trial, Mr. Dominguez testified to the following with the assistance of an interpreter. He spoke some English but could not read English. He currently lived at a house located at 1314 School Street in Lombard. The house's former address was 1S154 School Street.

¶ 7 He and his wife first learned about the house in October 2001, the house was part of the Co-op, and to move into the house, they had to purchase a membership in the Co-op. At the time, neither he nor his wife had enough money to purchase the membership. He testified both that he obtained a loan and that he did not remember obtaining a loan. He did not remember attending a closing or making any loan payments. His wife handled the family's finances. When presented with copies of the Note, Security Agreement, and Membership Agreement, he acknowledged that the signatures and initials looked like his, but he did not remember signing them.

¶ 8 At trial, Mrs. Dominguez testified that she and her husband learned about the Dwelling Unit in October 2001, and that her husband obtained a loan from First Home Mortgage to purchase their membership in the Co-op, but that she did not remember all the details of the transaction, as it had occurred 17 years prior. She handled the finances for the family and paid the bills, including the loan payments. Around 2008 or 2009 she stopped making loan payments and stopped paying the property taxes and insurance for the home. She recalled signing the Membership Agreement but did not recall if her husband was with her when she signed the document. She acknowledged that one of the signatures appeared to be her husband's. She also acknowledged that the signatures and initials on the Note and Security Agreement appeared to be her husband's.

¶ 9 Katherine Ortwerth testified as follows. She was employed as a senior loan analyst with plaintiff and had worked there for five years. Plaintiff used two record keeping systems, one called the Vault, which was used to store documents created or received by plaintiff, and another called REALServicing, which tracked transactions, payments, disbursements, and conversations with the borrowers. Ortwerth was trained in the use of these systems, and data was entered into these systems shortly after a transaction was completed in the regular course of business. She had been trained to understand the previous loan servicer, Homeward Residential's (Homeward) systems,

which included MSP and FileNet, and had used MSP at her previous employer. REALServicing worked in a similar manner to MSP, and FileNet worked in a similar manner to the Vault.

¶ 10 Ortwerth testified that Fannie Mae owned the loan and plaintiff serviced the loan on its behalf. The loan was previously serviced by Homeward which was formerly known as American Home Mortgage Servicing, Inc. plaintiff purchased Homeward. Plaintiff began servicing the loan in April of 2013. Around this time, Homeward's records were transferred to plaintiff's systems.

¶ 11 Ortwerth had reviewed plaintiff's records which stated that Fannie Mae obtained the loan in 2002. She confirmed this with the investment group. Based on her review of the payment histories, defendants had ceased making payments on the loan in December 2009 and produced records showing payments as far back as June 2008. The day prior to her testimony, Ortwerth prepared a report of indebtedness finding that $114,054.84 in principle, $77,243.87 in interest, $51,424.22 in taxes and insurance, $2189 in late charges, and $13,941.75 in fees and expenses were due and owing.

¶ 12 After considering the evidence, the trial court found in favor of plaintiff on counts IV and V against Mr. Dominguez and placed an equitable lien on his interest in the Dwelling Unit in the amount of $169,753.57 (representing the unpaid principle, property taxes, and insurance). The trial court based this decision on a finding that Mr. Dominguez had obtained a loan to finance the purchase of the membership in the Co-op; defendants had been paying that loan until December 2009 when they stopped paying the insurance and taxes as well; and that Fannie Mae was the owner of the debt. The trial court did not award a lien against Mrs. Dominguez's interest, as the court did not find any evidence that she was intended to be liable under the Note or Security Agreement.

¶ 13    Defendants filed a motion to reconsider and modify the judgment which was denied. At the August 5, 2019 hearing on that motion the trial court made a finding that there was no just reason for delaying appeal pursuant to Illinois Supreme Court Rule 304(a) (eff. Mar. 8, 2016). However, this language was not included in the written order. Defendants timely appealed, and the matter was remanded for the purposes of correcting the trial court order to include the Rule 304(a) language.

¶ 14                                II. ANALYSIS

¶ 15    Defendants raise several issues on appeal. They maintain that the trial court erred in denying their motion for summary judgment; that the trial court committed prejudicial error in admitting certain documents into evidence; that the trial court erred in awarding plaintiff an equitable lien on the Dwelling Unit; and that the trial court erred when it failed to rule on several of the claims in defendants' favor.

¶ 16                       A. Denial of Summary Judgment

¶ 17    Defendants argue that the trial court erred in denying their motion for summary judgment on counts IV and V. Plaintiff argues that because defendants' motion for summary judgment was denied and plaintiff ultimately prevailed on the counts at issue, any error in the denial of summary judgment merged into the judgment entered at trial. In reply, defendants maintain that their motion for summary judgment presented a legal question rather than a factual one, and therefore the denial is reviewable.

¶ 18    "As a general rule, when a motion for summary judgment is denied and the case proceeds to trial, the denial of summary judgment is not reviewable on appeal because the result of any error is merged into the judgment entered at trial." *Belleville Toyota, Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 199 Ill. 2d 325, 355-56 (2002). "The rationale for this rule is that review of the denial order

would be unjust to the prevailing party, who obtained a judgment after a more complete presentation of the evidence." *Id.* at 356. However, where the denied motion addresses a legal issue that is not addressed by the trier of fact, the denial will not merge with the trial's judgment. *Battles v. LaSalle National Bank*, 240 Ill. App. 3d 550, 558 (1992).

¶ 19    The primary argument of defendants' motion for summary judgment was that the undisputed evidence demonstrated that there was no intention on the part of the parties to create a lien against the Dwelling Unit at the time of the loan, and that therefore no equitable lien could be established. As such, the motion addressed whether there was a question of fact, rather than a legal issue. Moreover, the trial court's basis for denying the motion for summary judgment was that it found disputed issues of fact. As such, the denial of defendants' motion for summary judgment did not address a separate legal issue from the ones addressed at trial, and any error merged into the trial judgment.

¶ 20      B. Admissibility of Affidavit of Lost Note and Computer-Generated Records

¶ 21    Defendants argue that the trial court's admission of the computer-generated records of the defendants' payment history and the Affidavit of Lost Note into evidence was prejudicial error. The admissibility of evidence is reviewed for an abuse of discretion. *Worsley v. Farmington Pizza Co., Inc.*, 322 Ill. App. 3d 371, 373 (2001). "An abuse of discretion occurs only when the trial court's decision is arbitrary, fanciful, or unreasonable or where no reasonable person would take the view adopted by the trial court." *Seymour v. Collins*, 2015 IL 118432, ¶ 41.

¶ 22                    1. Admissibility of the Affidavit of Lost Note

¶ 23    Defendants argue that Affidavit of Lost Note was inadmissible because it was not based on Taylor's personal knowledge and because it is double hearsay.

¶ 24    Defendants argue that because the Affidavit was made only to the best of the affiant's knowledge, it did not constitute personal knowledge and was therefore inadmissible. Defendants claim that courts routinely find affidavits with such language to be ineffective and cites to *Jaffe v. Fogelson*, 137 Ill. App. 3d 961, 964 (1985). However, in *Jaffe* the court did not find the affidavit insufficient based on the "best of affiant's knowledge" language, but rather because the affiant could not identify the amount owed by defendants with sufficient specificity. *Id.* In the instant case, only the final line of the Affidavit contains the "to the best of my knowledge" language, and reads "To the best of my knowledge, the original Note has not been satisfied, pledged, assigned or hypothecated." When considered as a whole the affidavit demonstrates Taylor's personal knowledge of the contents, as such Taylor's use of the qualifier "to the best of my knowledge" in the final sentence does not render her Affidavit inadmissible. See *Northbrook Bank & Trust Co. v. 2120 Division LLC*, 2015 IL App (1st) 133426, ¶ 46 (finding an affidavit which contained "to the best of my knowledge" admissible when considered as a whole).

¶ 25    The Affidavit was admitted over the objection of defendants based on the business records exception to hearsay and based on the fact that the court found it to be a self-authenticating document under Illinois Rule of Evidence 902(8) (eff. Jan. 1, 2011). However, a self-authenticating document must still comply with other rules of evidence, such as the hearsay rule. *People ex rel. Madigan v. Kole*, 2012 IL App (2d) 110245, ¶ 51.

¶ 26    Defendants maintain that the Affidavit of Lost Note is double hearsay, as the affiant was Lindsey Taylor, who did not appear in court, and it contained statements from the Bank of New York and Pierce and Associates. " 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Ill. R. Evid. 801(c) (eff. Jan. 1, 2011). "Hearsay included within hearsay is not excluded under the

hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule provided in these rules." Ill. R. Evid. 805 (eff. Jan. 1, 2011).

¶ 27    With regard to the statements from the Bank of New York and Pierce and Associates, the Bank of New York advised that they had released the file to the previous servicer, and Pierce and Associates indicated that it was not in possession of the Note. These statements were submitted as part of Taylor's description of their efforts to locate the missing Note. As such, they were being submitted to demonstrate the thoroughness of the search for the Note, rather than for the truth of the matter asserted. See *United States v. Blandina*, 895 F.2d 293, 300-01 (7th Cir. 1989) (explaining that statements made by coin dealers to investigators that they had not bought coins from the defendant were not hearsay as they were not offered to prove the truth of the matter asserted, but rather the thoroughness of the investigation); *Servants of Paraclete, Inc. v. Great American Insurance Co.*, 866 F. Supp. 1560, 1567 (D.N.M. 1994) (statements by three individuals to the defendant insurance company's administrator that they had no knowledge of the plaintiff's insurance coverage were not hearsay as they were not offered for their truth, but to show the diligence of the administrator's unsuccessful search);*People v. Thompson*, 2016 IL 118667, ¶ 40, *as modified on denial of reh'g* (Mar. 28, 2016) (we may look to federal law interpreting similar rules for guidance). Accordingly, the statements of the bank and law firm were not double hearsay.

¶ 28    However, Taylor's Affidavit of Lost Note hearsay. It is an out-of-court statement which was offered for the truth of the matter asserted (*i.e.*, that Fannie Mae owned the Note, but had lost it). Accordingly, to be admissible it must fall within one of the exceptions to the hearsay rule.

¶ 29    At trial, the Affidavit was admitted under the business records exception. See Ill. R. Evid. 803(6) (eff. Jan. 1, 2011); Ill. S. Ct. Rule 236 (eff. Aug. 1, 1992). The business record exception "requires only that the party tendering the record satisfy the foundation requirement of

demonstrating that the record was made in the regular course of business and at or near the time of the transaction." *In re Estate of Weiland*, 338 Ill. App. 3d 585, 600 (2003), *as amended on reh'g* (Apr. 25, 2003). A record prepared in anticipation of litigation is not one made in the ordinary course of business and is inadmissible under the business records exception. *In re A.B.*, 308 Ill. App. 3d 227, 236 (1999). "A record is prepared in anticipation of litigation if it is prepared with an eye toward pending or anticipated litigation of any kind." *Id.* The Affidavit of Lost Note was signed on July 10, 2015, over four years after plaintiff's Complaint was filed on May 26, 2011. While Ortwerth testified that the Affidavit of Lost Note was found among plaintiff's business records, to claim that this document was not prepared in anticipation of litigation strains credulity. The Affidavit was prepared after the initiation of the litigation, notarized, and declared that plaintiff held the Note and later lost it. The date of its execution, subject matter, and surrounding circumstances all indicate that it was made in preparation for litigation. See 810 ILCS 5/3-309 (West 2018) (discussing requirements to enforce a lost or destroyed instrument). Accordingly, because the Affidavit of Lost Note was prepared in anticipation of litigation, it is not admissible under the business records exception to the hearsay rule. As such, it was error for the trial court to admit the Affidavit of Lost Note into evidence.

¶ 30                 2. Admissibility of Computer-Generated Records

¶ 31     Defendants, relying on *People v. Nixon*, maintain that in order for computer-generated records to be admitted under the business records exception to the hearsay rule the proponent must establish the following:

> "(1) that the computer software system was customarily used in the business for
> this purpose; (2) that the same system had been in place during the relevant time period;
> (3) that the system was regularly checked and tested for reliability; and (4) that its access

was restricted to trained personnel who had been authorized to use it." *People v. Nixon*, 2015 IL App (1st) 130132, ¶ 112.

This is incorrect. In order for computer-generated records to be deemed admissible the proponent must show "the equipment which produced the record is recognized as standard, the entries were made in the regular course of business at or reasonably near the happening of the event recorded and the sources of information, method and time of preparation were such as to indicate their trustworthiness and to justify their admission." *US Bank, National Ass'n v. Avdic*, 2014 IL App (1st) 121759, ¶ 25 (quoting *Riley v. Jones Bros. Const. Co.*, 198 Ill. App. 3d 822, 829 (1990)). The language defendants rely on from *Nixon* represents the foundation established by the plaintiff in *Avdic* and is not intended to create a different set of elements for the exception to hearsay. *Nixon*, 2015 IL App (1st) 130132, ¶ 112. (discussing *Avdic*, 2014 IL App (1st) 121759, ¶ 25).

¶ 32    With regard to plaintiff's computer systems, Ortwerth testified that plaintiff used two systems, the Vault for digitally imaging documents and REALServicing to track transactions. She testified that these were similar to systems she had used with other employers and similar to those used by Homeward Residential, plaintiff's predecessor. This testimony tends to indicate that this type of software is customarily used in the industry.

¶ 33    Ortwerth further testified that when plaintiff acquired Homeward, around March or April 2013, plaintiff transferred Homeward's records from Homeward's Filenet system to plaintiff's Vault system and from Homeward's MSP system to plaintiff's REALServicing system as appropriate. This demonstrates that those systems have been in place since Homeward was acquired. Additionally, Ortwerth testified that the records were inputted to the systems at or near the time of the underlying transaction or event and that this was done in the regular course of plaintiff's business.

¶ 34 Defendants argue that most of the pertinent information comes from Homeward's records rather than plaintiff's, and that Ortwerth cannot lay the proper foundation for those records. In response, citing *Bayview Loan Servicing v. Cornejo*, 2015 IL App (3d) 140412, ¶ 19, plaintiff argues that someone familiar with a business record may testify to records made in the course of business, even if those records were created by a prior entity. In *Bayview*, the court held that a Bayview employee's affidavit regarding the amount due and owing on a loan was admissible despite being based on data and records produced by a previous entity. *Id.* While the *Bayview* court did not explicitly address computer-generated documents, given the age of the case and the use of the word "data," presumably the records were computer-generated. Additionally, as part of her training with plaintiff, Ortwerth was trained in how Homeward's systems worked, and even had experience with MSP from a previous employer.

¶ 35 Defendants also argue that Ortwerth did not have a computer science background and as such could not testify to the accuracy or reliability of the system. However, defendants cited no case in support of the implicit assertion that a computer science background is required to lay a proper foundation for computer-generated documents. Given the ubiquity of computer-generated records, it would be unduly burdensome to require litigants to do so. Accordingly, it was not an abuse of discretion to admit the computer-generated documents.

¶ 36 "Evidentiary rulings will not be reversed unless the error was substantially prejudicial and affected the outcome of trial." (Internal quotation marks omitted.) *Holland v. Schwan's Home Service, Inc.*, 2013 IL App (5th) 110560, ¶ 192. Where an error does not affect the outcome of case, or where the reviewing court can see from the entire record that no harm has been done, the judgment will not be reversed. *J.L. Simmons Co., Inc. ex rel. Hartford Insurance Group v. Firestone Tire & Rubber Co.*, 108 Ill. 2d 106, 115 (1985).

¶ 37    "When erroneously admitted evidence is cumulative and does not otherwise prejudice the objecting party, error in its admission is harmless." *Greaney v. Industrial Comm'n*, 358 Ill. App. 3d 1002, 1013 (2005). As such, we must look to whether the remaining evidence is otherwise sufficient to demonstrate plaintiff's claims.

¶ 38                          C. Imposition of Equitable Lien

¶ 39    "The imposition of an equitable lien is a remedy for a debt that cannot be legally enforced, but which ought in right and fairness to be recognized." *CitiMortgage, Inc. v. Parille*, 2016 IL App (2d) 150286, ¶ 33.

> "The essential elements of an equitable lien are (1) a debt, duty, or obligation defendant owed to plaintiff and (2) the existence of a *res* that, in some way, is particularly related to the debt or obligation. *** [A]n equitable lien may be found either (1) where the parties expressed in writing their intention to make real property, personal property, or some fund the security for a debt but did not use express lien language or (2) where considerations of fairness and justice would require imposing a lien even without an express agreement between the parties." *Paliatka v. Bush*, 2018 IL App (1st) 172435, ¶ 28.

In the instant case, the trial court determined that relief could be granted either based on the parties' intention to create a security interest, or on considerations of fairness and justice.

¶ 40    With regard to whether the trial court erred in awarding plaintiff an equitable lien, different standards of review apply to the different aspects of that decision. To the extent that the decision hinged on the construction of the loan documents, the standard of review is *de novo*. *Lewsader v. Wal-Mart Stores, Inc.*, 296 Ill. App. 3d 169, 179 (1998). To the extent decision turned on the trial court's determination that a debt, duty, or obligation existed, the standard of review is whether the trial court's factual findings are against the manifest weight of the evidence. *Leith v. Frost*, 387

Ill. App. 3d 430, 434 (2008). "A finding is against the manifest weight of the evidence if the finding is unreasonable, arbitrary, or not based on evidence." *Id.* Lastly, to the extent the trial court's decision was based on principles of equity and fairness, "[t]he determination to grant or deny equitable relief is a matter of trial court discretion." *American National Bank & Trust Co. of Chicago v. Vinson*, 273 Ill. App. 3d 541, 543 (1995).

¶ 41    1. Trial Court's Finding of Debt was not Against Manifest Weight of Evidence

¶ 42    We now turn to whether there was sufficient evidence to establish Mr. Dominguez's debt to plaintiff without the Affidavit of Lost Note, and thus whether its admission constituted prejudicial error. Plaintiff argues that the Affidavit of Lost Note was not introduced to support its equitable lien claims, but rather in support of its claim for breach of the Note, and further it does not need to demonstrate that it has standing to enforce the Note to have prevailed on its equitable lien claims. Plaintiff is correct that it did not necessarily need to prove that it was entitled to collect on the Note in order to have prevailed on its equitable lien claims. However, the Affidavit of Lost Note was undoubtedly favorable evidence of plaintiff's claims, and therefore, we must look at the remaining evidence that defendants owed a debt to plaintiff.

¶ 43    In addition to the issue of the Affidavit of Lost Note, defendants argue that the stamps at the bottom of the note indicated Note indicate that a special indorsement had been created in favor of Wells Fargo, and therefore the Note could not have been transferred to plaintiff. Defendants further argue that plaintiff's answer to their Interrogatory 14 acknowledged this fact. Defendant maintains that the special interrogatories established *prima facie* evidence that plaintiff lacked standing to enforce the Note/loan. In support, defendants cite two cases: *Deutsche Bank National Trust Co. v. Gilbert*, 2012 IL App (2d) 120164, *as modified on denial of reh'g* (Dec. 28, 2012); and *Green Tree Servicing, LLC v. Karella*, 2018 IL App (2d) 170423-U. *Green Tree* was entered

pursuant to the previous version of Illinois Supreme Court Rule 23(b) (eff. January 1, 2007) and as such may not be cited for this purpose. In *Gilbert* we found that a bank employee's affidavit that a note was transferred on a certain date was inadmissible under Illinois Supreme Court Rule 191(a) (eff. Jul. 1, 2002) because it did not include the facts on which that knowledge was based nor include the documents on which the employee relied. *Gilbert*, 2012 IL App (2d) 120164, ¶¶ 19-20. As *Gilbert* addressed the sufficiency of an affidavit under Rule 191(a), its applicability to the instant matter is limited.

¶ 44    As to the special indorsements, Section 3-205 of the Uniform Commercial Code reads as follows:

> "(a) If an indorsement is made by the holder of an instrument, whether payable to an identified person or payable to bearer, and the indorsement identifies a person to whom it makes the instrument payable, it is a "special indorsement." When specially indorsed, an instrument becomes payable to the identified person and may be negotiated only by the indorsement of that person. The principles stated in Section 3-110 apply to special indorsements.

> (b) If an indorsement is made by the holder of an instrument and it is not a special indorsement, it is a "blank indorsement." When indorsed in blank, an instrument becomes payable to bearer and may be negotiated by transfer of possession alone until specially indorsed.

> (c) The holder may convert a blank indorsement that consists only of a signature into a special indorsement by writing, above the signature of the indorser, words identifying the person to whom the instrument is made payable.

(d) 'Anomalous indorsement' means an indorsement made by a person that is not the holder of the instrument. An anomalous indorsement does not affect the manner in which the instrument may be negotiated." 810 ILCS 5/3-205 (West 2018).

¶ 45    Regarding the stamps at the end of the Note, the stamp signed "First Home Mortgage" appears to have possibly been a blank indorsement, as it does not specifically identify anyone to whom payment is entitled, though it is not clear whether that stamp was contemporaneous with the others, and thus might have been a special indorsement instead. The other stamps are likewise ambiguous. We cannot tell which stamp came first, or under what circumstances the one stamp was crossed out, but evidently the intent was to make either the crossed-out institution and/or Wells Fargo the holder of the special indorsement. So, while it may be reasonable to conclude that the effect of the stamps was to create a special indorsement, it is unclear to whom that indorsement was made.

¶ 46    However, the Note produced at trial was not the original, but a copy. As such we do not know whether any subsequent indorsements were made after the date of the copy. It is possible that an appropriate indorsement was made transferring the Note to Fannie Mae. So, while the indorsements are undoubtedly evidence demonstrating Fannie Mae is not entitled to enforce the Note, they are not dispositive of the issue.

¶ 47    With regard to plaintiff's answer to defendants' Interrogatory 14, defendants asked plaintiff to identify all transfers of the Note, and in its answer plaintiff directed defendants to the Note and Affidavit of Lost Note. Defendants maintain that this is an admission that the Note contained a special indorsement in favor of Wells Fargo. While answers to interrogatories can be admitted into evidence as a statement of a party opponent, *Buehler v. Whalen*, 41 Ill. App. 3d 446, 456 (1976), *aff'd,* 70 Ill. 2d 51 (1977), we disagree that plaintiff's answer constitutes such an admission that

Wells Fargo and not Fannie Mae is the only owner of the Note. As we just discussed, the stamps are ambiguous.

¶ 48     The evidence in favor of a finding of debt is as follows. Defendants both acknowledged that the signatures and initials on the loan documents appeared to be those of Mr. Dominguez. They likewise acknowledge that they obtained a loan to finance the purchase of their membership in the Co-op. A copy of the Note was found in plaintiff's files. The Note stated that Mr. Dominguez received a loan from First Home Mortgage in the amount of $126,800.00, which he agreed to repay at an annual interest rate of 7.375%. Ms. Ortwerth testified that she reviewed plaintiff's files and based on that review she determined that Fannie Mae (whose loans plaintiff services) had acquired the Note in 2002. Defendants correctly point out that no document was produced with such a notation, so this statement is of limited value. The payment records produced at trial showed that plaintiff's predecessor, American Home Mortgage Servicing Inc., n/k/a Homeward Residential, had been receiving payments on the loan as early as July 2008 and that payment stopped in December 2009. This was corroborated by Mrs. Dominguez's testimony that she stopped making loan payments around 2008 or 2009. Ms. Ortwerth likewise testified that plaintiff had been paying the property taxes and insurance on the Dwelling Unit since December of 2009. This was also corroborated by Mrs. Dominguez's testimony that she had ceased paying property taxes and insurance.

¶ 49     Taken as a whole, the trial court's finding that defendants owed plaintiff a debt was not against the manifest weight of the evidence. While there is evidence to support the assertion that the Note was transferred to another entity, and while there was no evidence regarding a transfer of interest to Fannie Mae; the loan documents for the purchase of the Co-op membership were in plaintiff's system, and even without the Affidavit of Lost Note, there was evidence demonstrating

that plaintiff's predecessor was receiving payments on the loan from the Dominguez's for a period of 16 months. Further, there was no testimony from the defendants of any other entity trying to collect payment from them during that time.

¶ 50                          2. Intent to Create a Lien

¶ 51    Defendants argue that the facts do not support a finding of an equitable lien against the Dwelling Unit, as there was never any intention on the part of the parties to the loan to create a lien on the fee title interest of the Dwelling Unit, since defendants were purchasing a membership in the Co-op rather than the Dwelling Unit itself. We agree with defendants that it was not the parties' intention to create a lien on the Dwelling Unit itself at the time the documents were executed.

¶ 52    The Security Agreement stated that Mr. Dominguez was pledging his "lease" of the "apartment" as security to the loan, as well as his "00" shares in the Co-op. The Agreement also listed the Dwelling Unit as being in "New York" and stated that New York law applied to the Agreement. Looking at the Agreement in context with the rest of the loan documents, it is evident that the parties intended to create a security interest in Mr. Dominguez's membership, but used an inappropriate form.

¶ 53    Defendants maintain that the form used for the Security Agreement was intended for use in a "stock cooperative" and cites as an example *Sinnissippi Apartments, Inc. v. Hubbard*, 114 Ill. App. 3d 151 (1983). Defendants maintain that this type of co-op is distinct from the one in the instant case, arguing that the York Co-op more closely resembles the co-op in *Cent. Terrace Co-op. v. Martin*, 211 Ill. App. 3d 130, 133-34 (1991), which the court found distinguishable from that in *Sinnissippi* in that no lease or landlord tenant relationship was created. We agree with defendants that no lease was created by the defendants' purchase of the Co-op membership nor

did defendants obtain any stock. As such, the Cooperative Loan Security Agreement did not create an enforceable lien.

¶ 54    Defendants then argue that because the Agreement covered the entire subject matter of the contract, yet did not create a lien, no equitable lien can be imposed, citing *Uptown National Bank of Chicago v. Stramer*, 218 Ill. App. 3d 905, 908 (1991), and *Bankers Trust Co. v. Chicago Title & Trust Co.*, 89 Ill. App. 3d 1014, 1018 (1980). We disagree. An equitable lien may be found where the parties intended to make some property or funds, security for a loan, but failed to include lien language. *Paliatka v. Bush*, 2018 IL App (1st) 172435, ¶ 28. In *Uptown*, the parties' agreement listed defendant's business assets as security, but not her personal assets, and the court found that because there was no intention to place a lien on her personal assets at the time of the parties' agreement, no equitable lien could be placed. *Uptown National Bank of Chicago*, 218 Ill. App. 3d at 907-09. In *Bankers Trust Co.*, the intervenor lawyer was not entitled to an equitable lien where the parties agreement stated that he would be paid from the proceeds of a loan on one of 66 parcels of land. *Bankers Trust Co.*, 89 Ill. App. 3d at __. Neither of these cases is particularly applicable, as in *Bankers Trust Co.* there was no intention of making *any* security agreement, and in *Uptown* the security agreement specifically attached to certain property and not others.

¶ 55    Plaintiff's argument is essentially that because the Agreement did not create a lien in the Membership, there can be no equitable lien. This argument is without merit. The Security Agreement by its terms clearly intended to create a security interest in *something*. The parties would not have signed it with the intent of making nothing into security, and from the context that something is of course being the membership in the Co-op. Evidently, the person who drafted the document was aware that a membership was not stock in the Co-op and likened it to a lease. As such, a lien was clearly intended in the membership.

¶ 56          3. The Dwelling Unit is a *Res* Particularly Related to the Debt

¶ 57    To justify the imposition of an equitable lien, there must be a *res* which is particularly related to Mr. Dominguez's debt. *Paliatka v. Bush*, 2018 IL App (1st) 172435, ¶ 28. The parties' original intended security for the loan, defendants' membership in the Co-op, no longer exists. Per the Dissolution Order, defendants' membership was converted into a judicial deed to the Dwelling Unit in 2008. Per that order, if a membership had been pledged as security or collateral for the loan, the judicial deed would be encumbered by that security interest as if it were a mortgage. As such, had the Security Agreement created a security interest in the membership as intended, it would have been converted into a mortgage on the Dwelling Unit.

¶ 58    Therefore, we have a situation in which the membership was intended as security to the original loan, where the defendants' membership in the Co-op was what entitled them to receive title to the Dwelling Unit, and in which had the intended lien been effective, the Dwelling Unit would have become the new security interest for the loan. Accordingly, the Dwelling Unit is a *res* that is particularly related to the debt.

¶ 59          4. Considerations of Fairness and Justice Require a Lien.

¶ 60    While defendants correctly maintain that "[t]he tendency is to limit rather than to extend the doctrine of constructive liens" (*Pruitt Office Machines v. Liberty National Bank of Chicago*, 341 Ill. App. 146, 149 (1950)), the facts of this case are unique, and even if there were no express agreement of the parties, a lien would be warranted. As a result of unusual circumstances, the security interest to which an equitable lien would normally have attached, *i.e.*, the membership, was dissolved, and in exchange defendants received title to the Dwelling Unit. For nine years at the time of trial, defendants have lived at the Dwelling Unit without repaying the loan or paying property taxes or insurance. It would be contrary to notions of fairness and justice to allow

defendants to deprive plaintiff of the security interest that, per the parties' intentions, it should have had.

¶ 61    Apart from the debt arising from the original loan, the trail court also found that plaintiff's payment of the property taxes and insurance for the Dwelling Unit was a basis for establishing an equitable lien. Defendants have made no argument in their brief as to why that basis is insufficient. See *Partipilo v. Hallman*, 156 Ill. App. 3d 806, 811 (1st Dist. 1987) (man who paid property taxes improperly assessed against him for improvements on neighbor's property had an unjust enrichment claim against the neighbor); and *Uptown* 218 Ill. App. 3d at 908 (unjust enrichment claim can form the basis of an equitable lien). Accordingly, the trial court did not err in awarding an equitable lien.

¶ 62                              E. Remaining Counts

¶ 63    Defendants maintain that the trial court erred when it failed to enter judgment in favor of defendants on counts I-III and in favor of Mrs. Dominguez on counts IV-V. Based on our review of the proceedings on defendants' motion to modify and reconsider as well as the proceedings on limited remand, it is clear the trial court found in favor of defendants on the remaining counts. As such, defendants already have the relief they are seeking, and the issue is moot. *ChiCorp, Inc. v. Bower*, 336 Ill. App. 3d 132, 137 (2002) (an issue is moot when its resolution would have no practical effect on the controversy).

¶ 64                              III. CONCLUSION

¶ 65    The trial court's denial of defendants' motion for summary judgment merged with the judgment at trial, and as such there was no basis for review. The admission of the Affidavit of Lost Note into evidence was an abuse of discretion but did not constitute reversible error. Accordingly, the trial court did not err in granting the equitable lien.

¶ 66    For the reasons stated, we affirm the judgment of the Du Page County circuit court.

¶ 67    Affirmed.