2021 IL App (3d) 170621

Opinion filed February 23, 2021

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2021

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 10th Judicial Circuit, Peoria County, Illinois. |
| Plaintiff-Appellee, | ) ) | Appeal No. 3-17-0621 |
| v. | ) ) | Circuit No. 15-CF-484 |
| | ) | |
| DARREN D. BROWN, | ) ) | The Honorable John P. Vespa, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE DAUGHERITY delivered the judgment of the court, with opinion.
Justice O'Brien concurred in the judgment and opinion.
Justice Wright dissented, with opinion.

_____

**OPINION**

¶ 1    After a jury trial, defendant was found guilty of first degree murder (720 ILCS 5/9-1(a)(2) (West 2014)) and aggravated battery (*id.* § 12-3.05(e)(1)) and was sentenced to consecutive prison terms of 55 years and 8 years, respectively. Defendant appeals his convictions and sentences, arguing that (1) the trial court erred in allowing the State to present testimony at defendant's jury trial regarding the contents of defendant's cell phone records and (2) the statutory sentencing scheme that required the trial court to sentence the 22-year-old defendant (at the time of the offense) to a *de facto* life without parole sentence for first degree murder was

unconstitutional, either on its face or as applied to defendant. We agree with defendant's first argument. We, therefore, reverse defendant's convictions and remand this case for a new trial. Having reached that conclusion, we decline to rule upon defendant's second argument.

¶ 2                                      I. BACKGROUND

¶ 3        On July 14, 2015, shortly before 11 p.m., Nikko Smith and Charles Shelton were shot in the kitchen of Smith's home on West Kettelle Street in Peoria, Illinois. Smith died as result of his injuries.The following day, Shelton identified defendant in a photo lineup as the person who had committed the offenses. A warrant was issued for defendant's arrest. About two weeks later, defendant was taken into custody in the state of Georgia, where he lived.

¶ 4        The following month, in August 2015, defendant was charged by indictment with first degree murder for the killing of Smith and with aggravated battery for the shooting of Shelton.[1] The indictment alleged, among other things, that in committing the murder, defendant had "personally shot" Smith, an allegation that, if proven, would trigger a 25-years-to-life sentencing enhancement (730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2014)) for the offense.

¶ 5        In July 2017, after an earlier mistrial, defendant's case proceeded to a jury trial. The evidence presented at trial established that just prior to the shooting, Smith, who was 25 years old, was seated at the kitchen table in his home on West Kettelle Street in Peoria, Illinois, packaging cocaine for sale. Smith sold cocaine out of the home on a regular basis and packaged cocaine in the home about twice a week. Also present in the home at that time were Smith's father, Jessie, who was blind; Smith's uncle, Charles Shelton; Kendrick Wilson, who went by the

_____

[1]Defendant was also charged with unlawful possession of a weapon by a felon. That charge, however, was later dismissed on the motion of the State.

2

nickname of "Big Four"; and Freddie Dothard. Shelton and Wilson were in the kitchen with Smith, Jessie was in the bathroom, and Dothard was in the front of the home.

¶ 6    At about 10:50 p.m., a male subject (referred to hereinafter at times as the intruder or the offender) with dreadlocks in his hair entered the kitchen carrying a silver revolver in his hand. The intruder ordered Shelton and Wilson to get on the floor, put the gun to Smith's head, and indicated to Smith that he was taking the money and the drugs. Upon either receiving or taking those items from Smith, the intruder headed for the back door, which was located in the kitchen, taking Smith with him at gunpoint. The back door was missing a doorknob and was barricaded using a wood two-by-four to keep it from being opened from the outside. As the intruder was trying to remove the barricade, Smith resisted. A struggle ensued. Shelton jumped up, and the intruder shot Shelton in the stomach and leg. Wilson ran to the front door and escaped. Jessie came out of the bathroom, and Shelton yelled at Jessie to stay where he was, as Shelton crawled toward the hallway.

¶ 7    The police arrived a short time later and cleared the residence. Upon doing so, the officers found Smith lying dead facedown on the kitchen floor with a large pool of blood around his head. He had been shot once underneath the chin at close range. The bullet went through his mouth and neck, fractured his second cervical vertebrae, and severed his spinal cord. He died almost instantly.

¶ 8    The police processed the scene and collected evidence. The officers found latex gloves, plastic Baggies, and suspected cocaine on the kitchen table. The officers also found latex gloves on Smith's hands. Although the officers checked the scene for fingerprints, they did not find any fingerprints that were suitable for analysis or comparison. The officers did, however, recover two bullets from the kitchen floor of the residence. One of the bullets was found underneath Smith's

3

body; the other was found under the leg of a chair. Lab analysis later showed that both bullets had been fired from the same gun. Also found on the kitchen floor were two pieces of dreadlocked hair. The hair was sent to the crime lab for analysis and deoxyribonucleic acid (DNA) testing.

¶ 9        At trial, the only element of the offenses that was in dispute was the identity of the offender—whether defendant was the person who had committed the crimes. The evidence presented at trial as to that element can be summarized as follows. Shelton took the witness stand and identified defendant in court as the person who had put a gun to Smith's head, stating, "There you go, right there (indicating). I ain't never gonna forget him." In doing so, Shelton commented that defendant no longer had dreadlocks in his hair. During his testimony, Shelton described the opportunity he had to see the offender while the robbery was taking place, stating, "All along, I'm looking dead at him. I'm sitting on the floor looking at him, dead in his face looking at him."

¶ 10       In addition to his in-court identification, Shelton also had previously identified defendant in a photo lineup the day after the shooting and testified about the prior identification in court. Shelton was in the hospital being treated for his injuries at the time of the photo lineup and was discharged from the hospital later that day. The treating doctor had determined that Shelton did not need surgery because the bullets had not penetrated Shelton's abdominal cavity and because there were no bullets still remaining in Shelton's body. The photo lineup identification had been video recorded, and that recording was played for the jury. On the recording, Shelton had his eyes closed as the officer was reading the identification instructions, and the officer had to nudge Shelton or say Shelton's name to get his attention. The officer indicated on the witness stand that

4

he did not know if Shelton was falling asleep or not paying attention, and Shelton himself indicated in his testimony that he did not remember if he had fallen asleep at that time.

¶ 11 Shelton admitted during his testimony that he had smoked marijuana the day of the shooting about four or five hours before the shooting occurred, that he had used crack cocaine "way earlier" in the day, and that he had drunk two or three beers. Shelton did not feel, though, that he was intoxicated. The lab work that was done at the hospital when Shelton was treated for his injuries confirmed that Shelton had marijuana, cocaine, and alcohol in his system. In fact, Shelton's blood alcohol level was 0.202—more than twice the legal driving limit. The doctor who treated Shelton at the hospital, however, indicated that Shelton was alert, awake, and commanding normally and testified that it was difficult to describe the level of intoxication based upon the blood alcohol level because some people were more tolerant to alcohol than others. According to the doctor, some people at that blood alcohol level could be completely normal, and others would probably be in a coma. Shelton also admitted during his testimony that he had prior felony convictions for retail theft in 2004 and for unlawful possession of a controlled substance in 2005. In addition, although Shelton testified that he heard two gunshots during the shooting, he had apparently told the police immediately after the incident that he had only heard one gunshot.

¶ 12 The dreadlocked hair that was recovered from the kitchen floor after the shooting occurred was analyzed and was found to be "Negroid" head hair that contained DNA that matched defendant. Microscopic examination of the hair showed that at least one of the hairs had a "stretched" appearance, which indicated that the hair had been pulled out of a person's head. In addition, the expert who analyzed the dreadlocked hair under the microscope indicated in her

5

testimony that it would not be a normal part of the hair-shedding process for dreadlocks to just drop out of a person's head.

¶ 13     Wilson, who was called to the witness stand by the defense, did not make an in-court identification of the defendant and testified, when asked, that he did not see the offender in the courtroom. Wilson also did not make an identification of the offender when he was shown a photo lineup, which included defendant's picture, the day after the shooting occurred. The presentation of the photo lineup to Wilson had been video recorded, and that recording was played for the jury. In court, Wilson was shown the photo lineup again and stood by his prior statement that he did not see the offender in the lineup.

¶ 14     Wilson's testimony, however, was somewhat inconsistent, and Wilson confirmed during his testimony that he was nervous. When Wilson was asked during his testimony whether he had gotten a look at the intruder and whether he had been able to see what the intruder looked like, Wilson responded, "No, sir." Defense counsel asked Wilson questions about the intruder's appearance, and Wilson indicated that the intruder had "dreads" in his hair and was skinny. Based upon those responses, defense counsel returned to his prior questioning, stating, "So, let me clarify. Did you get a look at this person?" Wilson responded, "I mean yeah. I mean, like, I don't know what you askin' me. What you askin' me?" Upon further questioning, Wilson confirmed that he got a good look at the intruder and that he saw the intruder's face. Wilson stated, though, that he did not feel he would be able to recognize the intruder if he saw the intruder again. However, when Wilson had previously been asked that question by the police the day after the shooting, he told police that he would be able to identify the intruder if he saw the intruder again. During his testimony in court, Wilson denied that he knew defendant, denied that

6

he had ever called defendant, and denied that his phone number in July 2015 was a certain 309 number.

¶ 15        Defendant testified at trial on his own behalf and acknowledged that he had previously been convicted of a felony for residential burglary in 2010. Defendant stated that he lived in Georgia at the time of the offense and had not lived in Peoria since 2012. Defendant's mother still lived in Peoria in 2015. On about July 3, 2015, defendant returned to Peoria with his son for a family reunion. Defendant knew who Smith was but did not know Smith personally and did not know where Smith lived. Defendant knew that the West Kettelle Street house was a "crack house" but did not know that the West Kettelle Street house was Smith's house. While defendant was in Peoria for the family reunion, he went to the West Kettelle Street house one time, near July 14, 2015, to purchase crack cocaine.

¶ 16        On July 15, 2015, at about 3 a.m., defendant and his son left Peoria as planned to return to Georgia. They were driven back to Georgia by defendant's mother. When defendant learned that he was a suspect in the shooting, he did not immediately go back to Peoria because he had to work at his job and did not have money to go back. Defendant knew that the police were looking for him and was not trying to hide. Defendant testified further that he was not the person who entered Smith's house on July 14, 2015, and that he did not know who the person was who had committed the offenses. When the crimes were committed, defendant was at his mother's house, packing and getting ready to go back to Georgia.

¶ 17        At that time in July 2015, defendant had dreadlocks in his hair and had worn dreadlocks in his hair for the past two or three years. Defendant had cut his hair at some point prior to trial because he wanted to look presentable for court and because his dreadlocks were starting to fall

out. According to defendant, big clumps of his hair would fall out on their own because he was not taking care of his dreadlocks.

¶ 18        Defendant acknowledged during his testimony that, even though he knew he was a suspect in the shooting, he did not turn himself in and did not contact the Peoria police about the matter. Defendant admitted that he had told the police that he had never been to Smith's house but stated in his testimony that he did not know at the time of his police statement that the West Kettelle Street house was where Smith lived.

¶ 19        As rebuttal evidence, the State presented the testimony of Peoria police officer Matthew Ray. Ray testified that he had been assigned to investigate the shooting in this case. The day after the shooting, Wilson returned Ray's phone call. The cell phone number that Wilson had called Ray from was the 309 number. After contacting Ray, Wilson came to the police station and spoke to Ray about the shooting.

¶ 20        During his investigation, Ray obtained records for defendant's cell phone, a certain Sprint telephone number, for the time period around when the shooting took place. Upon receiving and examining the phone records, Ray saw that Wilson had made numerous phone calls to defendant both before and after the shooting. According to Ray, the police were notified of the shooting on July 14 at 10:53 p.m., and Wilson had called defendant's cell phone on July 14 at 10:42 p.m. for 31 seconds, at 10:55 p.m. for 31 seconds, at 11:08 p.m.[2] for 30 seconds, at 11:08 p.m. for 104 seconds, at 11:24 p.m. for 24 seconds, at 11:55 p.m. for 37 seconds, and at 11:56 p.m. for 14 seconds. The phone records also showed that defendant had called Wilson's cell phone on July

_____

[2]Ray incorrectly indicated in his testimony that the third phone call started at 11:03 p.m. (2303:20) on July 14 and ended at 11:08 p.m. (2308:50). The actual phone records, however, show that both the third and the fourth phone calls took place at 11:08 p.m., and Ray indicated in his testimony that the duration of the third phone call was 30 seconds.

14 at 11:27 p.m. for 38 seconds. After receiving defendant's cell phone records and seeing that Wilson's phone number was on those records, the police tried to locate Wilson but were unable to find him.

¶ 21     During Ray's testimony, as the State was initially starting to question Ray about the cell phone records, the defense objected. The following conversation ensued:

> "[DEFENSE COUNSEL]: Objection, Judge. Foundation and authentication. I don't think the State can enter this type of record without a representative of the company.
>
> [THE PROSECUTOR]: It's a self-authenticating document, Judge.
>
> THE COURT: Anything else in that regard, Attorney [defense counsel]?
>
> [DEFENSE COUNSEL]: Stand by my objection.
>
> THE COURT: Objection is overruled. You can go ahead and consider the witness's answer."

¶ 22     Although Ray testified as to the contents of the phone records, there is no clear indication that the records were ever formally admitted into evidence. The phone records are contained, however, in the trial court exhibits that have been made part of the record on appeal. Attached as the first page of the phone records was a certification from Danielle Keeler, the custodian of the records for Sprint. At the top of the certification was the title, "CERTIFICATION PURSUANT TO RULES 803(6) AND 902(11) OF THE FEDERAL RULES OF EVIDENCE AND 28 U.S.C. § 1746." In the certification, Keeler attested, among other things, that she was certifying that the records attached (1) "were made at or near the time of the occurrence of the matters set forth in the records, by, or from information transmitted by, a person with knowledge of those matters"; (2) "were kept in the course of the regularly conducted business activity"; and (3) "were made by

9

the regularly conducted business activity as a regular practice." The certification was signed by Keeler and notarized, and Keeler declared in the certification under penalty of perjury that the statements she had made in the certification were true and correct.

¶ 23　　　　During closing arguments, the State argued that, based upon the strength of Shelton's identification of defendant and the DNA evidence, it had proven that defendant was the person who had committed the crimes. As for Wilson's failure to identify defendant, the State noted that the remainder of Wilson's testimony about the shooting was consistent with Shelton's. The State pointed to the phone records to suggest that Wilson was lying when he failed to identify defendant since the phone records showed that Wilson had been in contact with defendant around the time of the shooting, even though Wilson had testified that he did not know defendant and had not called or contacted defendant. The State went further in the rebuttal portion of its closing argument and suggested that Wilson was "in on" the crimes.

¶ 24　　　　Defense counsel argued in closing argument that the State had not proven beyond a reasonable doubt that defendant was the person who had committed the crimes. Defense counsel suggested to the jury that the DNA evidence was not conclusive because DNA analysis alone could not determine when or how a person's DNA got to a particular location. Defense counsel also noted that there were limitations to DNA analysis—because DNA could be transferred from one person or location to another and could be contaminated through human error—and argued to the jury that the DNA evidence in this case was unreliable. As for the credibility of Wilson's failure to identify defendant as the person who had committed the crimes, defense counsel asserted that the phone records were unconvincing because Wilson denied that the 309 number was his phone number and denied that he knew or had contacted defendant. Defense counsel asserted further that there was no good reason for the jury to believe that the 309 number was

10

Wilson's since the State did not present a representative from the phone company to testify to that effect and since there was nothing presented by the State to satisfy the jury that the phone records were authentic, reliable, and credible evidence. As for Shelton's identification, defense counsel told the jury that it was unreliable because Shelton had used alcohol and drugs prior to the shooting and had been through a traumatic experience.

¶ 25 After deliberating for about an hour, the jury found defendant guilty of both first degree murder and aggravated battery. The trial court ordered that a presentence investigation report be prepared on defendant and set the case for a hearing on posttrial motions. Defendant subsequently filed a motion for judgment notwithstanding the verdict or for new trial. In the motion, defendant argued, among other things, that the trial court erred in allowing the State to introduce the phone records into evidence, despite defendant's objection as to a lack of a proper foundation. After a hearing, the trial court denied the motion.

¶ 26 A sentencing hearing was held immediately thereafter. During the sentencing hearing, the attorneys and the trial court agreed that defendant was subject to a sentencing range of 45 years to life in prison (20 to 60 years with a 25-years-to-life sentencing enhancement added on) for first degree murder and 6 to 30 years in prison for aggravated battery and that defendant would have to serve the sentences for the two offenses consecutively. At the conclusion of the sentencing hearing, the trial court sentenced defendant to consecutive prison terms of 55 years for first degree murder and 8 years for aggravated battery.

¶ 27 Defendant filed a motion to reconsider sentence, which the trial court denied. Defendant appealed.

¶ 28 II. ANALYSIS

¶ 29 A. Admission of Officer Ray's Testimony
Regarding the Content of Defendant's Cell Phone Records

11

¶ 30	On appeal, defendant argues first that the trial court erred in allowing the State to present testimony at defendant's jury trial regarding the contents of defendant's cell phone records. Defendant asserts that such testimony should not have been allowed because the State failed to present a sufficient foundation for the admission of the phone records into evidence as a business record. In making that assertion, defendant notes that (1) neither the actual phone records nor the custodian of the record's certificate was admitted into evidence in this case and (2) even if the custodian's certificate had been admitted, the foundation for admission was still insufficient because the custodian's certificate was missing the second set of foundational elements that was required under the law for a computer-generated record to be admitted into evidence as a business record (see *People v. Nixon*, 2015 IL App (1st) 130132, ¶¶ 110-11; *People v. Kent*, 2017 IL App (2d) 140917, ¶ 129). Furthermore, defendant contends, he was substantially prejudiced by the erroneous admission of the evidence because it established that he and Wilson were in phone contact with each other shortly before and after the shooting, which was contrary to their testimony and served to destroy their credibility at trial. For all of the reasons stated, defendant asks that we reverse his convictions and that we remand this case for a new trial.

¶ 31	The State argues that the trial court's ruling was proper and should be upheld. In support of that argument, the State asserts first that no error occurred in the admission of the phone records testimony in this case because the State presented the proper foundation for the admission of the phone records as provided for in the amended version of Illinois Rule of Evidence 902, which, according to the State, eliminated the second set of foundational requirements for a computer-generated record (see Ill. R. Evid. 902(12) (eff. Sept. 28, 2018)). While making that assertion, the State acknowledges that Rule 902 was not amended until after the trial in this case but asserts, nevertheless, that the amendment applies retroactively here

because Rule 902 is a procedural rule. Second, and in the alternative, the State asserts that, even if the phone records testimony was erroneously admitted in this case, any error that occurred was harmless because the evidence of defendant's guilt was overwhelming. For both of the reasons set forth, therefore, the State asks that we affirm defendant's convictions.

¶ 32 In reply to the State's assertions, defendant contends first that the later amendment to Rule 902 has no bearing on this issue because the amendment was made after the trial in this case had already taken place. In the alternative, defendant contends that, even if the amendment applies retroactively to the trial in this case, the testimony regarding the phone records was still improperly admitted because the foundation presented by the State did not comply with the amended rule, which, according to defendant, was consistent with the rule that had been established by the case law. For those reasons and the reasons initially stated, defendant asks that we reverse his convictions and that we remand this case for a new trial.

¶ 33 A trial court's ruling on the admissibility of evidence will not be reversed on appeal absent an abuse of discretion. *People v. Pikes*, 2013 IL 115171, ¶ 12; *People v. Illgen*, 145 Ill. 2d 353, 364 (1991). The threshold for finding an abuse of discretion is a high one and will not be overcome unless it can be said that the trial court's ruling was arbitrary, fanciful, or unreasonable or that no reasonable person would have taken the view adopted by the trial court. See *In re Leona W.*, 228 Ill. 2d 439, 460 (2008); *People v. Donoho*, 204 Ill. 2d 159, 182 (2003). Furthermore, even if the trial court has committed an abuse of discretion in the admission of evidence, it will not warrant a reversal of the trial court's judgment unless the record indicates the existence of substantial prejudice affecting the outcome of the trial. See *People v. Jackson*, 232 Ill. 2d 246, 265 (2009); *Leona W.*, 228 Ill. 2d at 460; *Nixon*, 2015 IL App (1st) 130132, ¶ 101.

¶ 34    Although not quite clear from the record before us, it appears that the majority of the information contained in defendant's cell phone records and testified to by Officer Ray was computer-generated information—information that was generated instantaneously by a computer when telephone calls were made to or from defendant's cell phone. See *Kent*, 2017 IL App (2d) 140917, ¶ 128 (indicating that the billing data generated instantaneously by a computer when a telephone call is made is an example of a computer-generated record, the spontaneously created tangible result of the internal electrical and mechanical operations of the computer itself, which is not dependent upon the observations and reporting of a human declarant); see also *People v. Holowko*, 109 Ill. 2d 187, 191-93 (1985) (distinguishing between computer-generated records and computer-stored records). For such a record to be admitted into evidence under the business-records exception to the hearsay rule, the proponent of the evidence must establish two sets of foundational requirements. See *Nixon*, 2015 IL App (1st) 130132, ¶¶ 110-11; *Kent*, 2017 IL App (2d) 140917, ¶ 129. First, the proponent must establish the three foundational elements commonly associated with the admission of a business record: (1) that the record was made as a memorandum or record of the act, (2) that the record was made in the regular course of business, and (3) that it was the regular course of the business to make such a record at the time of the act or within a reasonable time thereafter. See Ill. R. Evid. 803(6) (eff. Apr. 26, 2012); 725 ILCS 5/115-5(a) (West 2014); *Nixon*, 2015 IL App (1st) 130132, ¶ 110; *Kent*, 2017 IL App (2d) 140917, ¶ 129. Second, the proponent must establish four additional foundational elements that are specific to computer-generated records: (1) that standard equipment was used; (2) that the particular computer generates accurate records when used appropriately; (3) that the computer was used appropriately; and (4) that the sources of the information, the method of recording, and the time of preparation indicate that the record is trustworthy and should be admitted into

14

evidence. *Nixon*, 2015 IL App (1st) 130132, ¶ 111; *Kent*, 2017 IL App (2d) 140917, ¶ 129.

Unless the proponent of the evidence makes both of the required showings, the computer-generated business record will not be admitted into evidence. See *Nixon*, 2015 IL App (1st) 130132, ¶¶ 105, 110-11; *Kent*, 2017 IL App (2d) 140917, ¶¶ 129-30.

¶ 35        In the present case, after having reviewed the trial court proceedings and the certification of the custodian of the records for the phone company, we find that the State failed to satisfy the second set of foundational elements that are required for the admission of a computer-generated record into evidence under the business-records exception to the hearsay rule. See *Nixon*, 2015 IL App (1st) 130132, ¶¶ 110-11; *Kent*, 2017 IL App (2d) 140917, ¶ 129. Indeed, the State failed to present any evidence, by certification or otherwise, to establish the four foundational elements that are specific to a computer-generated record. See *Nixon*, 2015 IL App (1st) 130132, ¶ 111; *Kent*, 2017 IL App (2d) 140917, ¶ 129. Thus, even if we were to excuse the State's failure to move the phone records into evidence, we would still have to find that the trial court committed an abuse of discretion by allowing the State to present the testimony of Officer Ray regarding the content of the phone records because the State failed to establish a sufficient foundation for the admission of the phone records into evidence.[3] See *Leona W.*, 228 Ill. 2d at 460; *Donoho*, 204 Ill. 2d at 182.

---

[3]The parties have not specifically addressed whether the State's failure to formally move the phone records and the certification into evidence would require a reversal in this case. Defendant merely suggests that it would not have been proper for the jurors to take the phone records into the jury room with them and that it was not proper for the State to refer to the certification in closing argument. The State acknowledges that it inadvertently forget to formally admit the phone records and the certification into evidence during defendant's jury trial but, nevertheless, maintains that there is no indication in the record that the jurors took the phone records with them into the jury room, that defense counsel did not object to that procedure, and that any error that occurred in that regard was harmless. Because the parties have not specifically addressed what effect the State's failure to move the phone records into evidence has on this on case, if any, we decline to rule upon that matter.

We take no position on whether it would be permissible for Officer Ray to testify about the contents of the phone records, even if the phone records had been properly admitted into evidence as a

¶ 36    Furthermore, contrary to the assertion of the State, the admission of the phone records testimony was not harmless in this case. See *Leona W.*, 228 Ill. 2d at 460; *Nixon*, 2015 IL App (1st) 130132, ¶ 101. The only element of the offenses that was in dispute at defendant's jury trial was the identity of the offender (whether defendant was the person who had committed the two offenses). The State presented the testimony of Shelton, who identified defendant as the person who had committed the crimes, and the DNA results, which showed that defendant's hair was found at the crime scene after the offenses had been committed. The defendant countered with the testimony of Wilson, who indicated through his nonidentification of defendant that defendant was not the person who had committed the crimes, and the testimony of defendant himself that he did not commit the offenses and that his hair (DNA) may have been at the crime scene because he had purchased drugs at that location earlier. The phone records testimony, which showed that defendant and Wilson had been in contact with each other, destroyed Wilson's and defendant's credibility, as both had testified that they did not know each other and had not been in contact with each other. The phone records testimony, therefore, was a crucial piece of evidence in this case. Thus, we must conclude that the erroneous admission of that testimony substantially prejudiced defendant and affected the outcome of the trial such that a reversal and remand for new trial in this case is warranted. See *Leona W.*, 228 Ill. 2d at 460; *Nixon*, 2015 IL App (1st) 130132, ¶ 101.

---

business record. We note, however, that the business-records exception to the hearsay rule allows for records to be admitted into evidence but does not generally allow for a witness to testify about the contents of those records. See *PennyMac Corp. v. Colley*, 2015 IL App (3d) 140964, ¶ 17 (indicating that with the business-records exception, it is the business record itself that is admissible, not the witness's testimony); *Smith v. Williams*, 34 Ill. App. 3d 677, 680 (1975) (indicating that it would be improper for the custodian of the records to summarize the contents of the records in his or her testimony).

¶ 37    In reaching that conclusion, we have considered the State's other assertion—that the subsequent amendment to Rule 902 eliminated the second set of foundational elements required for the admission of a computer-generated record into evidence as a business record (see Ill. R. Evid. 902(12) (eff. Sept. 28, 2018)). The amendment to which the State refers took place after the trial in this case had already occurred. See *id.* Thus, even if we assume for argument's sake that the amendment made the change in the foundational requirements that the State suggests, we would still have to reject the State's argument here because the amendment cannot be applied retroactively in this case. See *People v. Hunter*, 2017 IL 121306, ¶¶ 36-37 (recognizing that a new procedural rule would not apply retroactively to proceedings that had already taken place before the new rule was enacted).

¶ 38                    B. Constitutionality of Statutory Sentencing Scheme

¶ 39    As his second point of contention on appeal, defendant argues that the statutory sentencing scheme that required the trial court to sentence the 22-year-old defendant (at the time of the offense) to a *de facto* life without parole sentence for first degree murder was unconstitutional, either on its face or as applied to defendant. Because we have already determined that a reversal and remand for new trial is required in this case, we decline to rule upon defendant's second point of contention.

¶ 40                                III. CONCLUSION

¶ 41    For the foregoing reasons, we reverse defendant's convictions and remand this case for a new trial.

¶ 42    Reversed and remanded.

¶ 43    JUSTICE WRIGHT, dissenting:

17

¶ 44    I respectfully dissent on two grounds. First, I observe that reversible judicial error is not present in this record. Alternatively, the evidentiary error, if any, was harmless. For purposes of this separate offering, a brief review of the trial evidence is necessary.

¶ 45    During the early investigation of this murder, an eyewitness to the intrusion, Shelton, viewed a pretrial photo lineup put together by law enforcement. As a result of that photo lineup, Shelton identified defendant as the intruder that shot Shelton and then shot and killed the victim.

¶ 46    Also, during the early investigation of this murder, another eyewitness, Kendrick Wilson, spoke to the investigators. Wilson stated that he was present in the apartment when an intruder held the victim at gunpoint. Wilson said that he was able to get a good look at the intruder and would be able to make an identification. However, after viewing a photo lineup put together by law enforcement, Wilson did not identify any person in the photo array as the intruder. Defendant's photo was included in that array.

¶ 47    Both eyewitnesses testified before the jury. Shelton testified for the State. Wilson testified for the defense. Thus, the jury was called upon to evaluate the credibility of each eyewitness's account. The jury learned that DNA evidence confirmed Shelton's pretrial identification of defendant by linking defendant to a dreadlock the intruder lost during a struggle with the victim.

¶ 48    Contrary to Shelton's testimony for the prosecution, Wilson testified that he did not get a good look at the intruder. Then, at defense counsel's request, Wilson scanned the courtroom and testified that the intruder was not present in the courtroom that day.

¶ 49    During Wilson's cross-examination, the State attempted to weaken Wilson's credibility by demonstrating Wilson and defendant knew each other before the murder. Wilson denied that his cell phone records would show any calls between Wilson's cell phone and defendant's cell phone close in time to the murder.

18

¶ 50        Consequently, during the rebuttal portion of the trial, the State completed the impeachment of Wilson by calling a rebuttal witness, Officer Ray. The purpose of Officer Ray's rebuttal testimony was to summarize certified cell phone records, obtained by a search warrant, that contradicted Wilson's trial testimony. The computer-generated business records documented multiple cell phone calls between Wilson's cell phone and defendant's cell phone that took place shortly before and after the murder. Using abbreviated language, defense counsel stated his objection to Officer Ray's testimony as follows: "Foundation and authentication. I don't think the State can enter this type of record without a representative of the company."

¶ 51        Using similar shorthand language in the jury's presence, the State made a counterargument to the defense's objection by asserting the records, present in the courtroom at that time, were "self-authenticating." When the trial court asked defense counsel for a response to the State's self-authentication argument, defense counsel did not refine his objection. Significantly, defense counsel did not argue that the self-authenticating certification language on the face of the business records was incomplete. Instead, defense counsel stood on his original objection claiming live testimony from a representative of the cell phone company was required for a proper foundation .

¶ 52        On appeal, defendant criticizes the trial court by pointing out that the word "certification" was not mentioned by the trial court. Defendant's observation is accurate. Defense counsel did not request the trial court to examine the language of the certification by claiming the language was incomplete. Hence, the court's silence with respect to certification is solely attributable to defense counsel's silence and results in waiver.

¶ 53        Respectfully, without a defense objection to the sufficiency of the certification on the face of the records, the trial court did not have an obligation to evaluate the certification *sua sponte*. In my view, the trial court made the correct ruling during a rapid-paced trial, based on the objection

19

that the prosecution was required to present testimony from a representative of the cell phone company before Officer Ray could summarize the contents of the computer-generated business records. Therefore, I would affirm defendant's convictions in the absence of judicial error.

¶ 54   That said, I recognize the posttrial motion filed by defense counsel skillfully and subtly refined the basis for defense counsel's trial objection. However, referencing the incomplete certification language for the first time in a posttrial motion, without a corresponding trial objection on the same grounds, did not properly preserve the issue concerning the sufficiency of the certification language for our review. Based on this record, I respectfully submit that defendant's convictions should not be overturned on an evidentiary issue the trial court did not have an opportunity to consider during trial. See *People v. Sanchez*, 2013 IL App (2d) 120445, ¶ 27.

¶ 55   Regardless of waiver, I am persuaded by the State's argument that the foundational error, if any, constitutes harmless error. In this case, the summary of the cell phone records is not alleged to contain misinformation causing prejudice. Importantly, the information discredited Wilson's testimony that denied any previous acquaintance with defendant. The jury received other evidence weakening Wilson's credibility such as his prior inconsistent statements to law enforcement and his prior felony conviction. For this reason, the cell phone call history presented to the jury in rebuttal was cumulative impeachment.

¶ 56   For the reasons discussed in this separate offering, I would affirm defendant's convictions without expressing any opinion on the retroactive application of the Illinois Rule of Evidence 902, as amended effective September 28, 2018, or the propriety of the sentences imposed by the court.

**No. 3-17-0621**

| | |
|---|---|
| **Cite as:** | *People v. Brown*, 2021 IL App (3d) 170621 |
| **Decision Under Review:** | Appeal from the Circuit Court of Peoria County, No. 15-CF-484; the Hon. John P. Vespa, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Peter A. Carusona, and Dimitri Golfis, of State Appellate Defender's Office, of Ottawa, for appellant. |
| **Attorneys for Appellee:** | Jodi Hoos, State's Attorney, of Peoria (Patrick Delfino, Thomas D. Arado, and Nicholas A. Atwood, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |